UNITED STATES, Appellee,

v.

Staff Sergeant Nathan R. WARNOCK, United States Army, Appellant.

254–94–8378.

U.S. Army Court of Military Review.

31 Dec. 1991.

For Appellant: Captain Edward T. Keable, JAGC (argued), Colonel Robert B. Kirby, JAGC, Captain James M. Heaton, JAGC, Captain Brian D. Bailey, JAGC (on brief).

For Appellee: Captain Donna L. Barlett, JAGC (argued), Colonel Alfred F. Arquilla, JAGC, Lieutenant Colonel Daniel J. Dell'Orto, JAGC, Colonel Dayton M. Cramer, JAGC, Major Thomas E. Booth, JAGC, Major Maria C. Fernandez, JAGC, Major Joseph C. Swetnam, JAGC (on brief).

Before FOREMAN, ISKRA and CREAN, Appellate Military Judges.

## OPINION OF THE COURT

FOREMAN, Senior Judge:

A special court-martial composed of officer and enlisted members convicted the appellant, contrary to his pleas, of adultery (Specification 1 of the Charge), and photographing a female officer in the nude and showing the negatives to a junior enlisted soldier (Specification 2 of the Charge), in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934 (1982) [hereinafter UCMJ]. The approved sentence provides for reduction to pay grade E–3 and forfeiture of $612.00 pay per month for four months. The Judge Advocate General has referred the case to the court pursuant to Article 69(d)(1) of the Uniform Code of Military Justice, 10 U.S.C. § 869(a) (Supp. I 1983) for review pursuant to Article 66 of the Code, 10 U.S.C. § 866 (Supp. I 1983).

The appellant contends that his conduct, photographing a female officer in the nude, with her consent, and showing the negatives to a junior enlisted soldier who was the officer's current paramour, is not a criminal offense. First Lieutenant (1LT) A testified that she and the appellant engaged in sexual intercourse on numerous occasions, beginning in April of 1988. On one of those occasions, the appellant photographed 1LT A while she was nude. She initially objected but then consented after the appellant told her that the photographs were for his personal use only. 1LT A terminated the relationship in May 1988 after the appellant told her that he wanted his girlfriend in the United States to join him in Korea. In late May or early June, the appellant told 1LT A that his girlfriend would not join him in Korea. 1LT A and the appellant then resumed their relationship. In early June 1988, while the appellant and 1LT A were at a club in Taegu, the appellant introduced 1LT A to Private

First Class (PFC) B, a member of appellant's unit, referring to her as a lieutenant. A short time later, 1LT A found out that the appellant was married, contrary to his earlier representations, and again she terminated the relationship. The appellant tried to resume the relationship in late June or early July, but 1LT A adamantly refused. By this time, 1LT A had begun having a sexual relationship with PFC B. In late July or early August 1988, the appellant approached PFC B in the unit motor pool and showed him the negatives of the nude photographs of 1LT A. PFC B testified that the appellant said, "These are my pictures of accomplishment," as though he were "bragging or something." PFC B testified that he was not offended by the negatives. In his words, "[I]t didn't bother me, it didn't phase me...." In response to a question by the military judge, PFC B testified that he was not offended by the appellant's conduct. He asked 1LT A about the negatives, and she acknowledged that they were pictures of her. PFC B testified, "It was dropped from there." PFC B's testimony indicated that he regarded his relationship with 1LT A as purely sexual rather than romantic or social.

First Sergeant (1SG) A, a defense witness, was asked on cross-examination to comment on the effect of a staff sergeant showing a picture of a nude female officer to a PFC. 1SG A responded that, "I guess that something like that there would be a discredit to the leadership within the unit itself as far as the particular person who did that." The trial counsel then asked, "Wouldn't it be fair to say that the respect that the PFCs hold the NCO Corps in has probably been diminished and degraded?" 1SG A responded, "Yes, sir, probably to a certain extent within the unit at least."

The key issue in this case was whether the appellant's showing of the negatives to PFC B was "prejudicial to good order and discipline." The prosecution was required to prove that the appellant's conduct was "palpably and directly prejudicial to the good order and discipline of the service." *United States v. Sadinsky,* 34 C.M.R. 343, 346 (C.M.A.1964).

Since this case was referred to us under the provisions of Article 69(d)(1), our review is limited to the legal sufficiency of the evidence. Article 69(e), UCMJ. In this case prejudice to good order and discipline can be predicated on two possible theories: first, diminished respect for 1LT A, and second, diminished respect for the appellant as a noncommissioned officer.

There is no credible evidence that the appellant displayed the negatives to any enlisted soldiers other than PFC B. There is no evidence that anyone else in the unit knew about the negatives until they were discovered by law enforcement authorities during an unrelated investigation.

We find that prejudice to good order and discipline cannot be predicated on any diminished respect for 1LT A, because 1LT A's authority and entitlement to respect from both PFC B and the appellant was already destroyed. The only evidence supporting the theory of diminished respect for the appellant as a noncommissioned officer is 1SG A's general and speculative testimony elicited by the trial counsel on cross-examination. PFC B was unaffected by the appellant's conduct. He regarded the appellant's conduct as bragging about his sexual conquests, nothing more.

Likewise, we find nothing in PFC B's testimony from which we can deduce or infer that his respect for the appellant as a noncommissioned officer was diminished. There is no evidence from which we can infer the other enlisted soldiers had diminished respect for the appellant, because the appellant showed the negatives only to PFC B.

While the appellant's conduct was certainly reprehensible and below the standards expected of a noncommissioned officer, Article 134 is not a "catchall as to make every irregular, mischievous, or improper act a court-martial offense." *United States v. Perez,* 33 M.J. 1050 (A.C.M.R. 1991) (quoting *United States v. Sadinsky,* 34 C.M.R. at 345. The requirement for "direct and palpable" prejudice to good order and discipline means that the conduct "must be easily recognizable as criminal, must have a direct and immediate adverse

impact on discipline, and must be judged in the context surrounding the acts." *United States v. Henderson*, 32 M.J. 941, 944 (N.M.C.M.R.1991). As Judge Kilday recognized long ago, "While *some* discredit no doubt attaches to any act or omission falling short of the optimum norm, it is settled that not every such incident is of the dishonorable, deceitful, and compromising nature recognized under ... Article 134 of the Code." *United States v. Giordano*, 35 C.M.R. 135, 143 (C.M.A.1964). A breach of the principles of leadership, standing alone, "generally is only a lack of good judgment—not a crime." *United States v. Light*, 36 C.M.R. 579, 584 (A.B.R.1965). We hold that the evidence in the appellant's case is legally insufficient to prove the "direct and palpable" prejudice to good order and discipline required to constitute a violation of Article 134.

We turn next to the appellant's contentions that the military judge failed to remain impartial, prejudiced the appellant's right to a fair trial, and erred by denying a defense challenge against him for cause. The appellant bases his contention on several exchanges between the military judge and the trial defense counsel, Captain (CPT) J, some of which occurred in the presence of the court members.

Even before the first witness was called, the following exchange occurred after the military judge declined to rule on a defense motion *in limine* (to preclude 1LT A from testifying that the appellant had infected her with genital herpes) until he could see the evidentiary context.

TC: I'm not sure I understand your ruling, sir.

MJ: What I am saying is we won't start—or you will not, for example, hypothetically call the so-called victim and during her dissertation have her—you can call and she may very well say, "I contracted it" but whether or not evidence to corroborate that would be admissible depends on what the rest of the evidence says. Do you understand that?

DC: Yes, Your Honor, but we would state that once this evidence is brought before the panel members, the prejudicial impact is—

MJ: Well, that's what I've just told you, trial—defense counsel, it will not come before them until I've weighed the probative value with the prejudicial impact. Now, her representation that she got it from him, I won't preclude her from saying that.

DC: That's what we're objecting to, Your Honor, the fact that if she get up—

MJ: Well, you know,—

DC: —in front of the panel—

MJ: —I hope you would have objection to more than that.

DC: —and states that.

MJ: Well, if she states that, she is also going to state she had sex with him. Are you going to object [to] that?

DC: No, I'm not going to object to that, but what does that—

MJ: Understand my ruling. I've just denied any portion of your motion that may say that you object to her saying she contacted (sic) herpes from him.

DC: Your Honor, it's our position she—

MJ: I understand your position. I understand your position.

DC: She's not qualified to state that she contracted it from him, because she—

MJ: She—she is qualified to say she got it and she can say she thinks she got it from him, can she not? It doesn't require an expert to say that.

DC: Your Honor, we're stating that—

MJ: I've told you what the ruling is.

DC: Yes, sir.

MJ: Sit down on it. I'm telling you right now that I won't allow any additional evidence pertaining to it by the government, unless I have a chance to—until such time as I've had a chance to weigh that evidence.

Shortly thereafter, the defense tendered evidence that sexual promiscuity was condoned by the command, and the trial counsel objected.

TC: Your Honor, the government could march a line of witnesses—

MJ: Wait a minute. He may not be through yet.

DC: I'm through, Your Honor.

MJ: Oh, okay. Well, normally the way this works is when you finish, you sit down.

DC: Yes, Your Honor.

MJ: Then the opposing counsel knows you're through.

During the direct examination of 1LT A, with the court members present, CPT J repeated an objection which had been overruled in a session out of the presence of the members, provoking the military judge to caution him: "I do not expect you will do that twice. You make your objection, it's recorded for posterity, and then it's over."

A few minutes later, CPT J objected to questioning which he regarded as leading. The military judge responded, "It's obvious he's not leading her anyway. Overruled."

When the trial counsel asked the appellant's battalion commander if he had appointed an Article 32 investigating officer to investigate the appellant's conduct, CPT J objected that the evidence was irrelevant. The trial counsel withdrew the question but CPT J pursued the matter as follows:

DC: Your Honor, we would ask for a side bar based on that last question.

MJ: Basis? Basis for your side bar? What do you want a side bar for?

DC: A mistrial—we're moving for a mistrial, Your Honor.

MJ: Denied.

DC: He's asking something—

MJ: Denied.

DC: —thats a prelude to a general court-martial.

MJ: Go ahead. It may very well be, but we've already had that and any anybody with common sense knows it. Sit down. Next question.

The appellant's company commander, Captain W, testified for the defense that the appellant's conduct had no adverse impact on good order and discipline in the company. During an out-of-court session, the military judge had ruled that the trial counsel would be permitted to ask CPT W if she had been charged with having an improper relationship with an enlisted soldier, but would not be permitted to ask

CPT W, directly or indirectly, if she was guilty of the charges. Nevertheless, the trial counsel pursued the matter, as follows:

TC: Wouldn't you agree that your perception of what may constitute good order and discipline may be out of line with the mainstream of the United States Army?

MJ: Don't answer the question.

DC: We would object, Your Honor.

TC: No further questions, Your Honor.

MJ: The court will disregard the question.

DC: Your Honor, once again we would move for a mistrial. That was a purposeful attempt to bias the jury by asking a question that is obviously objectionable.

MJ: If you thought it was obviously objectionable, why didn't you object?

DC: I was too—

MJ: Before I objected for you?

DC: —show, Your Honor.

MJ: Overruled.

DC: I will take the blame for that one.

MJ: Well, you can—there will be plenty of blame to go around. The mistrial request is denied.

During the redirect examination of a defense witness, 1SG A, CPT J confronted his witness with a prior inconsistent statement, and then offered the statement in evidence, causing the following exchange:

TC: Objection, Your Honor, he's impeaching his own witness.

MJ: Yes, but that's permissible under the present day rules since no one vouches for the credibility of a witness. Go ahead.

DC: Your Honor, I would request to move this into evidence, Defense Exhibit A.

MJ: No, we won't receive it into evidence. You've got the testimony of the witness, which is—not only confirms it—and you certainly are not going to present that to the court members. You know better than that.

During cross-examination of a defense witness, SFC V, the final exchange in the presence of the court members occurred:

DC: Objection, Your Honor.

TC: He could have in fact have had—

MJ: Just a minute. What's your basis for the objection?

DC: That misstates the evidence, Your Honor. He stated—

MJ: Overruled.

DC: —that he has gone—

MJ: Overruled. Sit down.

DC: Your Honor—

MJ: I said now—I won't tell you again. I have told you time and time again, when I overrule on your motion, that's the end of that motion.

DC: Well, Your Honor, we have a new objection to your attitude in front of this panel.

MJ: Well, all right, object to my attitude.

DC: We will, Your Honor. We—

MJ: It's recorded for posterity.

DC: We would like to take the panel on voir dire to determine whether you have affected their opinion in this case as to the defense case.

MJ: All right. Has anyone on the panel perceived—

DC: Individual voir dire, Your Honor.

MJ: I understand what you're saying, sit down. Perceived that in my comments to the defense counsel, or any other part of my conduct, would suggest to you that I am opposed to or—to the defense in its presentation of the case or that I have in any fashion formed an opinion as to the guilt or innocence of this accused? (Negative response.)

Negative responses from all members. Now, you've done it and you've asked for it. You caused me to do it. And the next time I tell you that your objection is overruled and you still continue to argue on it, I will hold you in contempt. Do you understand that?

DC: Yes, Your Honor.

MJ: Continue.

After both sides had rested, during an out-of-court session to consider instruc-tions, the military judge made the follow-ing statement.

Captain [J], this has happened with you and I in more trials than I want to recall. When I rule on an objection, you know the procedure. The procedure that ap-plies to all courts, whether it's a court-martial or a civilian court. When I rule, I afford you the opportunity to argue, I give you every opportunity to make your position known, and when I rule, that is it. I may be in error, but that is part of the appellate process and you have the right to appeal. You do not have the right to re-argue it before the court members or anyone else. And your atti-tude consistently has been offensive to me as the court—as the judge. And you do it again in any case whatsoever and I will hold you in contempt and I will fol-low that action up. And I want you to fully understand me. I have given you every opportunity in every case that you have sat on [sic] before me and yet you seem to fail to understand yet what the rules of engagement are. You refuse to learn and I will teach you a lesson if you do it again. Do you understand me?

The trial counsel also was the target of the military judge's criticism, although it was less frequent and less strident. The military judge excluded a record of nonjudi-cial punishment offered by the trial coun-sel, reflecting misconduct as an Army re-cruiter, because it was incomplete. He ex-cluded a letter of reprimand from a general officer, reflecting previous sexual miscon-duct, because the trial counsel could not show compliance with the regulation con-cerning filing of letters of reprimand in personnel records. After the trial coun-sel's argument on sentencing, the military judge instructed the members,

Now, [trial] counsel allowed during his closing argument that he was astounded by a number of things. Well, I am equally astounded that in that short clos-ing argument trial counsel has touched on no less than three potential reversible points.

■ The appellant's assignment of error raises two questions. First, should the mil-

itary judge have sustained the challenge against himself because he was biased against the defense? Second, did the military judge's conduct prejudice the appellant by suggesting to the court members that the defense case was meritless?

 In determining whether a military judge should have recused himself, the test is objective:

> [W]hether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality, not in the mind of the judge himself or even necessarily the mind of the [appellant], but rather in the mind of a reasonable man ... who has knowledge of "all the facts."

*United States v. Martinez,* 19 M.J. 652, 654 (A.C.M.R.1984), *petition denied,* 21 M.J. 27 (C.M.A.1985) *as quoted in United States v. Smith,* 30 M.J. 631, 634 (N.M.C.M.R.1990). The standard of review on appeal is whether the military judge abused his discretion by denying the challenge. *United States v. Clark,* 31 M.J. 721 (A.F.C.M.R.1990) *United States v. Smith,* 30 M.J. at 634, and cases cited therein.

Applying this test and standard of review to the first question, we find that the military judge was not biased against the defense, and we hold that he did not abuse his discretion by denying the challenge for cause. He sustained many of the defense objections. He severely limited the prosecutor's impeachment of a defense witness, CPT W. His instruction to the court members on findings by exceptions and substitutions, given over defense objection, worked to the appellant's benefit. He excluded potentially devastating prosecution evidence during the sentencing hearing. He severely undercut the trial counsel's sentencing argument. In short, the military judge was tough with both counsel, but uncivil with only the defense counsel.

 Turning to the second question, we are satisfied that the military judge did not prejudice the court members against the appellant. When the military judge commented on the lack of merit of some of the defense objections, it was clearly the case of an old lawyer chiding a young lawyer. None of the military judge's remarks expressed or implied any opinion regarding the merits of the defense case. When the military judge expressed impatience, it clearly was triggered by the defense counsel's refusal to stop arguing once a ruling had been made. We agree with our Air Force brothers that, "[W]hen the military judge rules, as when he indicates that discussion is closed and the parties must move forward, counsel disobey at their peril." *United States v. Clark,* 31 M.J. at 725. Although he clearly could have done so in a more civil and temperate manner, the military judge was well within his authority and responsibility to control the proceedings when he insisted that counsel desist and move on after a ruling has been made.

We note that the Court of Military Appeals has recognized that "a substantial risk of prejudice to the [appellant] is created when jurors are even aware that a defense attorney has been cited by the judge for contempt." *United States v. Burnett,* 27 M.J. 99, 107 (C.M.A.1988) (construing *Sacher v. United States,* 343 U.S. 1, 10, 72 S.Ct. 451, 455, 96 L.Ed. 717 (1952)). Although the military judge did not cite the trial defense counsel for contempt in this case, his threat to do so, in the presence of the court members, was only one step away.

 Nevertheless, we are satisfied that the military judge's conduct did not prejudice the appellant for several reasons. First, unlike the situation in *Burnett,* the military judge did not require the court members to determine whether CPT J should be held in contempt, nor did he tell them that CPT J's conduct amounted to contempt. Second, after his final exchange with CPT J, the military judge asked the court members whether they perceived him to be biased against the defense case, and he received a negative response. Even allowing for the possibility that some court members might have been reluctant to respond affirmatively to the military judge's inquiry, the military judge's inquiry had the same effect as a curative instruction reminding the members not to draw any

inferences regarding the appellant's guilt from the military judge's exchanges with CPT J. Finally, the evidence of the appellant's adultery with 1LT A was uncontroverted and overwhelming. Accordingly, we hold that the military judge's conduct did not prejudice the appellant.

We have considered the remaining assignments of error, including those personally asserted by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and have determined that they are without merit.

We are satisfied that, even if the court members had not convicted the appellant of Specification 2 of the Charge, they would have imposed the same forfeitures of pay and would have reduced the appellant at least two pay grades. *United States v. Sales*, 22 M.J. 305 (C.M.A.1986).

The finding of guilty of Specification 1 of the Charge (adultery) and the Charge are affirmed. The finding of guilty of Specification 2 of the Charge (showing the negatives to PFC B) is set aside. Specification 2 of the Charge is dismissed. Reassessing the sentence on the basis of the entire record and the error noted, the court affirms only so much of the sentence as provides for reduction to pay grade E–4 and forfeiture of $612.00 pay per month for four months.

Judge CREAN concurs.

ISKRA, Judge, dissenting:

I concur in affirming the conviction of adultery (Specification 1 of the Charge) and in that portion of the majority opinion which concludes that the military judge's conduct did not prejudice the appellant. I respectfully dissent from that portion of the opinion which holds that the evidence to Specification 2 of the Charge is legally insufficient to prove prejudice to good order and discipline of the armed forces.

As stated in the majority opinion, our review is limited to the legal sufficiency of the evidence because this case was referred to this court under the provision of Article 69(d)(1), Uniform Code of Military Justice. The test for legal sufficiency is whether viewing the evidence of record in a light most favorable to the government, a reasonable fact-finder could have found all essential elements beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324 (C.M.A.1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). I believe this test has been clearly met.

The appellant's acts of taking a photograph of a nude female officer and showing the negative of that photograph to a Private First Class (PFC), who was a member of his company, constitute conduct prejudicial to good order and discipline of the armed forces, notwithstanding the fact that the female officer was a paramour of the PFC. I agree with the majority that the finding of prejudice to good order and discipline cannot be predicated on diminished respect for the officer in the eyes of the PFC because the officer's authority and entitlement to respect was already compromised. I do, however, believe that there was sufficient evidence for the fact-finder to find that by taking a photograph of a nude officer and showing the negative to a lower-ranking enlisted person in the same unit, the appellant's leadership position and authority with that soldier was compromised and the image of the Noncommissioned Officers' Corps was tarnished.

The fact that the PFC stated that he was unaffected by the appellant's conduct is not dispositive of the issue. The appellant's conduct must be viewed from an objective standard when determining prejudice to good order and discipline. Was there legally sufficient evidence presented for the fact-finders to conclude that the appellant compromised his leadership role as a noncommissioned officer with respect to the appellant? The evidence that appellant took the photograph of a nude officer and showed a negative to a PFC in his unit is uncontroverted. This evidence alone would provide a reasonable basis for a finding that the appellant's conduct was prejudicial to good order and discipline.

In addition, the fact-finders were also provided with the expert testimony of the company first sergeant who, when asked to

comment on the effect of a staff sergeant showing a picture of a nude female officer to a PFC, responded, "I guess that something like that there would be a discredit to the leadership within the unit itself as far as the particular person who did that." When asked, "wouldn't it be fair to say that the respect that the PFCs hold the NCO Corps in has probably been diminished and degraded?" The first sergeant then responded, "Yes, sir, probably to a certain extent within the unit at least." The court members could have reasonably concluded from this colloquy that the appellant compromised his leadership position with a lower ranking enlisted person in his unit. There was an immediate and direct effect on the company because the appellant, by his conduct, divested himself of the status of a superior noncommissioned officer and, thereby, directly affected his professional relationship with a lower ranking enlisted person in his company. His conduct was "palpably and directly prejudicial to the good order and discipline of the service." *United States v. Sadinsky*, 34 C.M.R. at 345.

In my opinion, the statutory standard for legal sufficiency of the evidence has been met; accordingly, I would affirm the findings of guilty and the sentence.