UNITED STATES

v.

**Martin T. ACOSTA, 623 09 7256 Lance Corporal (E–3), U.S. Marine Corps.**

NMCM 9600429.

U.S. Navy–Marine Corps Court of Criminal Appeals.

Sentence Adjudged 13 July 1995.

Decided 21 March 1997.

LT James P. Benoit, JAGC, USNR, Appellate Defense Counsel.

LCDR Christian L. Reismeier, JAGC, USN, Appellate Government Counsel.

Before KEATING, CLARK and OLIVER, JJ.

OLIVER, Judge:

A general court-martial composed of officer members convicted the appellant, contrary to his pleas, of four specifications of wrongful distribution of methamphetamine and two specifications of wrongful use of methamphetamine, in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. § 912a (1994)[hereinafter UCMJ]. The court sentenced him to confinement for 10 years, total forfeiture of all pay and allowances, reduction to pay grade E–1, and a dishonorable discharge. The convening authority approved the findings and sentence as adjudged. However, exercising his powers of clemency, the convening authority suspended the execution of confinement in excess of 8 years for the period of confinement served plus 12 months. The appellant has raised five assignments of error.[1] Although

---

1.   I. APPELLANT WAS DENIED A FAIR TRIAL WHEN THE MILITARY JUDGE ABANDONED HIS ROLE AS AN IMPARTIAL AND NEUTRAL ARBITER AND ASSUMED THE ROLE OF A PARTISAN ADVOCATE FOR THE PROSECUTION BY SOLICITING EVIDENCE OF UNCHARGED MISCONDUCT IN ORDER TO NEGATE THE DEFENSE OF ENTRAPMENT.

II.   THE MILITARY JUDGE ERRED WHEN HE DENIED CIVILIAN DEFENSE COUNSEL'S CHALLENGE FOR CAUSE AGAINST A MEMBER WHO HAD A FREQUENT WORKING RELATIONSHIP WITH THE TRIAL COUNSEL, AND HAD AN UNYIELDING BELIEF IN THE RELIABILITY OF THE URINALYSIS PROGRAM OWING TO HIS RESPONSIBILITIES AS A SUBSTANCE ABUSE CONTROL OFFICER.   (References and citations omitted.)

III.   THE MILITARY JUDGE ERRED WHEN HE DENIED CIVILIAN DEFENSE COUNSEL'S CHALLENGE FOR CAUSE AGAINST A MEMBER WHO WAS AN INITIAL REVIEW OFFICER, AND THUS WAS A PART OF THE BASE LEGAL SYSTEM.   (References and citations omitted.)

IV.   AN UNSUSPENDED DISHONORABLE DISCHARGE IS INAPPROPRIATELY SEVERE GIVEN APPELLANT'S FAVORABLE MILITARY RECORD AND UNDER THE CIRCUMSTANCES OF THIS CASE. (References omitted.)

V.   THE STAFF JUDGE ADVOCATE FAILED TO SERVE HIS ADDENDUM TO THE STAFF JUDGE ADVOCATE'S RECOMMENDATION ON APPELLANT OR ON HIS CIVILIAN DEFENSE COUNSEL EVEN THOUGH IT CONTAINED NEW MATTER, SPECIFICALLY THE EFFECT OF A NEW DECISION BY THE COURT OF

we are concerned with the prosecutorial bent of some of the military judge's questions, we conclude that there were no errors prejudicial to the substantial rights of the appellant.

### The Military Judge's Questions

■ The appellant first contends that the military judge abandoned his obligation to remain impartial by soliciting testimony concerning an uncharged sale of cocaine the appellant made to Private Baumert, a "cooperating witness" for the Naval Criminal Investigative Service (NCIS), several months before the transactions which led to this court-martial. Although we believe that the military judge erred by personally questioning the witness to elicit this and other evidence, we conclude that this error did not materially prejudice the appellant's substantial rights.

■ Public confidence in the military justice system mandates that judges must maintain an impartial and neutral role while presiding over a court-martial. *United States v. Reynolds,* 24 M.J. 261, 264 (C.M.A. 1987). A military "judge may not abandon" his "impartial" role and "assist" the prosecution. *Id.* On the other hand, a military judge is not a "mere figurehead" or "simply an umpire in a contest between the Government and accused." *United States v. Kimble,* 23 U.S.C.M.A. 251, 49 C.M.R. 384, 386, 1974 WL 14087 (1974). RULE FOR COURTS-MARTIAL 801(c)[hereinafter R.C.M.], permits the court-martial "to obtain evidence in addition to that presented by the parties." R.C.M. 801(c), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.). Likewise, the Military Rules of Evidence permit the military judge to "interrogate witnesses." MIL. R. EVID. 614(b). The rules in the military and in Federal courts are virtually the same. *See* FED. R. EVID. 614(b).

■ The dilemma a trial judge must face is to assure that the court-martial members have the information they need while "scrupulously avoiding even the slightest appearance of partiality." *United States v. Shackelford,* 2 M.J. 17, 19 (C.M.A.1976). "Because

'jurors are ever watchful of the words that fall from him,' a military judge must be circumspect in what he says during the trial and in how he examines witnesses." *United States v. Loving,* 41 M.J. 213, 253 (1994)(citing *United States v. Clower,* 23 U.S.C.M.A. 15, 48 C.M.R. 307, 310, 1974 WL 13822 (1974), quoting *Bollenbach v. United States,* 326 U.S. 607, 612, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946)). In commenting on MIL. R. EVID. 614(b), experts in military jurisprudence have written: "Before the trial judge examines a witness ..., he should determine whether *that witness's testimony needs clarification or completion.* If the bench believes it does, questioning should be conducted with the greatest restraint. The military judge ... must continue to appear and must in fact be neutral...." STEPHEN A. SALTZBURG, ET AL., MILITARY RULES OF EVIDENCE MANUAL 709 (3d ed.1991). Let us review the relevant facts of this case.

During the Article 32 hearing prior to this general court-martial, Private Baumert testified in passing that he had purchased cocaine before from the appellant.[2] Concerned that this evidence of uncharged misconduct would be brought out before the members at the court-martial, the appellant's counsel filed a motion in limine, on the basis of MIL. R. EVID. 403, "to prevent the introduction of this evidence." Appellate Exhibit I at 2. During the discussion of this motion, the Government stated that it did not intend to introduce this evidence and did not "oppose the motion as it relates to uncharged misconduct." Record at 16. The military judge observed that there were "hypothetical situations" in which the Government could appropriately use such evidence, such as to rebut "a blanket denial" by the appellant of any involvement with drugs. Record at 17. The military judge then directed the trial counsel, "if this case takes an unusual turn of events," to request an Article 39(a) session before trying to use this evidence. *Id.*

During his opening argument, the civilian defense counsel laid out his planned approach

APPEALS FOR THE ARMED FORCES IN *United States v. Ramos,* 42 M.J. 392 (1995). (Citations omitted.)

2. The record does not indicate why this criminal transaction was not charged against the appellant at this general court-martial.

to the case. He stated that the evidence would show that his client was "not a sophisticated drug dealer." Record at 145. Instead, he merely tried to be a "life raft" for Private Baumert who had lost his normal supplier of crystal methamphetamine. *Id.* Private Baumert, in the meantime, was "desperate" to "target" someone who might sell him some drugs so that he could "save his skin" by getting the NCIS to report his cooperation to his command. *Id.* at 144. Although the defense counsel did not mention the word "entrapment" in his opening argument, this was clearly the gist of the defense's theory of the case.

Private Baumert was the first witness for the Government. He testified as to one uncontrolled buy and three controlled buys of methamphetamine he made from the appellant under NCIS auspices. He also testified as to his knowledge of the appellant's personal use of methamphetamine. Anticipating the entrapment defense, the trial counsel elicited testimony that the appellant displayed little or no reluctance in selling or using drugs on these occasions. Record at 152–61. A very extensive cross-examination followed, including many references to statements the witness had made during the Article 32 hearing. The defense counsel sought admissions that Private Baumert had been under great pressure to cooperate with the NCIS. Initially, he had identified Lance Corporal Nobbee as the individual he would target, but could not follow through because Nobbee had become an unauthorized absentee. As a result, Private Baumert admitted, in response to leading questions, that he had to "set someone else up" or "get somebody" to satisfy his NCIS handlers. Record at 169, 180. Although the civilian defense counsel used the word "entrapment" only once, one important thrust of the cross-examination (in addition to establishing that Private Baumert was not the most forthright and credible of witnesses) was that he, working with the NCIS, placed undue pressure on the appel-

lant to commit a crime he would otherwise not have done.

On redirect, the trial counsel appeared concerned primarily with damage control as to his witness' credibility; he did not deal with entrapment at all. In a brief follow-up, the civilian counsel immediately sought to reemphasize his theme that the witness was under great pressure from NCIS to set up a buy. He then renewed his attack on the witness's credibility. Record at 187–88.

The military judge next asked a series of 89 questions. Record at 189–96. Record at 191. Although some of these were housekeeping questions or tried to clarify the witness's earlier testimony, the focus of many of them was to nail down why the witness believed in late December 1994 that the appellant would be willing to sell him crystal methamphetamine.[3] Initially the witness testified that it was based only on "rumors." Record at 189. Upon further prompting by the military judge, the witness admitted that he had purchased drugs from the witness "earlier," in July 1994. Record at 191. At this point the following exchange took place:

> CC: Excuse me, Your Honor, if I could. Can we have a short 39(a), sir?
>
> MJ: No. Sit down, Mr. Tranberg. You raised an issue of entrapment.

*Id.* The witness then testified that this had happened only "one previous time" between July and December 1994. *Id.* Later, when the witness attempted to provide additional details about the July transaction, the military judge stated: "I don't want to know anything more about that. Okay?" Record at 192.[4] However, the military judge continued to interrogate the witness, making clear that the appellant had sold methamphetamine to the witness in December 1994 a month or so before he had become involved with the NCIS. Record at 192–93. Although this sale and the associated use was charged misconduct and the trial counsel had established

---

3. The flavor of this examination is best illustrated by quoting it verbatim. All of the military judge's questions of this witness from the trial transcript have been reproduced in the appendix to this opinion.

4. The civilian counsel, however, apparently did want the members to know more, and asked, at his very next opportunity: "Private Baumert, you've indicated that you previously bought cocaine from Lance Corporal Acosta. Is that correct?" The answer: "Yes, sir." Record at 196.

this sequence of events when he first questioned the witness, he had not emphasized it on redirect. *See* Record at 147–50. After the questioning by the military judge, however, and assuming they believed the witness, no reasonable member of the panel could have had any question but that the appellant was predisposed to distribute illegal drugs.

After both counsel had full opportunity to inquire of this witness, the military judge provided an instruction to the members as to the defense of entrapment. He also provided a very strict limiting instruction with respect to the testimony concerning the July 1994 transaction. Record at 198–99. The members posed no additional questions. The defense never objected to any of the military judge's questions or to his instructions.

The appellant now claims that the military judge abandoned his impartial role in four particulars: (1) by soliciting evidence of uncharged misconduct which he had earlier ruled inadmissible; (2) by rebutting the anticipated entrapment defense; (3) by refusing to hold an Article 39(a) session to discuss the line of questioning out of the presence of the members; and (4) by giving a limiting instruction that stated that the evidence he had elicited from the witness negated the entrapment defense. We will examine each area of concern.

The evidence of the July 1994 transaction, which was not admissible in the Government's case-in-chief, became admissible once the defense counsel had raised the defense of entrapment. As the Supreme Court put it: "Where the Government has induced an individual to break the law and the defense of entrapment is at issue, ... the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson v. United States*, 503 U.S. 540, 548–49, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 174 (1992); *see* R.C.M. 916(g). This testimony was evidence of a predisposition on the appellant's part to sell contraband drugs. As the military judge emphasized strongly to the members, the

evidence could not be used to show that the appellant was a bad person or had criminal tendencies and therefore likely committed the charged offenses. Record at 199. But it was relevant, and could be used, for the limited purpose of rebutting the defense of entrapment by helping to prove predisposition. *Id.*

At the time the military judge began questioning Private Baumert, the trial counsel had not taken advantage of the opportunity to walk through the door which the civilian defense counsel had opened. Both sides had had "a reasonable opportunity to properly present and support their contentions on any relevant matter." R.C.M. 801(a)(3), Discussion. Unless the military judge posed the questions regarding predisposition to the witness, the members would likely be deprived of this information which they might need to resolve a key fact at issue. The clear intent of the military judge's questions was to elicit relevant facts for the edification of the members. *See United States v. Dock*, 40 M.J. 112, 127 (C.M.A.1994).

The concern we have is that this military judge, unlike cases in which a judge is merely trying to resolve ambiguities in the witness' testimony or fill in gaps, knew the answer to the question before he asked it. Moreover, he appeared to be intervening on the side of the prosecution. Despite his statement to the members that the witness's testimony was "certainly to my surprise," Record at 199,[5] his questioning appeared designed to get into evidence the July 1994 drug transaction and other testimony as to predisposition. Unlike *United States v. Patterson*, 652 F.2d 1046, 1048 (D.C.Cir.), *cert. denied*, 454 U.S. 904, 102 S.Ct. 412, 70 L.Ed.2d 223 (1981), in which the trial judge "had no way of knowing what the answers would be," the judge in this case had ruled on a motion in limine and had before him Appellate Exhibit I, which gave him every reason to know the answer to his question. "Particularly when the questioning is designed to elicit answers favorable to the prosecution, 'it is far better for the trial judge to

---

**5.** Although the Government termed this statement as a "laudable" effort to appear impartial, Government Reply to Assignments of Error at 13

n. 5, we do not condone what we view as an affirmative misrepresentation which the military judge made to the members.

err on the side of [a]bstention from intervention in the case.'" *United States v. Green*, 429 F.2d 754, 760 (D.C.Cir.1970)(quoting *Blumberg v. United States*, 222 F.2d 496, 501 (5th Cir.1955)).

The Second Circuit recently concluded that the reversal of a conviction of a suspected drug dealer was required because the trial judge "[took] over the role of the prosecutor and display[ed] bias." *United States v. Filani*, 74 F.3d 378, 385 (2nd Cir.1996). In *Filani*, the judge zealously cross-examined the defendant, challenged his story, and demonstrated his disbelief in his testimony. *Id.* at 385–86. The trial judge also bolstered the Government's case by asking prosecution-friendly questions of other witnesses. *Id.* at 382, 386. *See also United States v. Moorehead*, 57 F.3d 875, 879 (9th Cir.1995)(finding that the "line of questioning pursued by the judge effectively eviscerated [the] defense and significantly reduced any possibility that the jury would acquit him.").

■ After a careful review of the record and case law, we believe that the military judge appeared to help the prosecution undermine the defense strategy when he elicited testimony from Private Baumert concerning the July 1994 drug transaction and several other adverse pieces of evidence. While it was appropriate for the members to have all of this evidence before them, it was error for the military judge to elicit it himself. In doing so, he crossed the line of acceptable judicial interrogation. *See Dock*, 40 M.J. at 128.

■ Moreover, we believe that the military judge committed additional error when he refused the civilian defense counsel's request for an Article 39(a) session. While this decision fell within his obligation to control the trial proceedings, *see* R.C.M. 801(a)(3); R.C.M. 803 (providing that a military judge "may, under Article 39(a), . . . call

the court-martial into session without the presence of members."), it placed the defense counsel in a dilemma. Either he acquiesced in the military judge's decision, which would deny him his right to make argument, R.C.M. 802(c), or he objected in front of the members, which might prejudice them against his client or call undue attention to the adverse testimony. Moreover, the military judge, in ruling on the appellant's motion in limine, advised counsel that, before this particular evidence would come before the members, there would have to be an Article 39(a) session. Record at 17.[6]

An Article 39(a) session would have permitted counsel to discuss the issue outside the presence of the members. Although we believe it unlikely that the members perceived the military judge's rather curt statement to the civilian defense counsel to "sit down" as indicating partiality on his part or otherwise prejudicing the defense, *see United States v. Warnock*, 34 M.J. 567, 572–73 (A.C.M.R.1991), we cannot be sure. The military judge did not provide any curative instruction or poll the members to ensure that no prejudice resulted. The better practice would have been for the military judge to grant the civilian defense counsel his request for an Article 39(a) session.

■ On the other hand, we believe that the guidance the military judge gave to the members concerning the entrapment defense and the limiting instruction he gave them concerning the evidence of the July 1994 drug transaction were both quite appropriate. The military judge left it to the members to decide whether or not to believe the witness's testimony. It was important to instruct them on this defense at that point in the trial so that they would be able to ask informed questions of the witness. He then

---

6. In making this ruling the military judge had advised both parties:

> I mean, I certainly have relatively high standards in that regard and unless something unusual develops in this case I don't see this [the possible introduction of this evidence of uncharged misconduct] becoming a problem. I will ask the government at this particular point before they seek—would seek, if this case

takes an unusual turn of events, to use this evidence that it notify me in advance so we can take it up in an Article 39(a) session. I think that disposes of this first motion in limine. Record at 17. The civilian defense counsel (and trial counsel) no doubt relied on this representation as ensuring that there would be an Article 39(a) session before the evidence would be introduced.

advised them properly that they had to limit this testimony to the issue of predisposition.

Our superior court recently announced the standard for determining whether the military judge committed reversible error in situations such as this. The appropriate test "is whether, 'taken as a whole in context of this trial,' a court-martial's 'legality, fairness, and impartiality' were put into doubt by the military judge's questions." *United States v. Ramos*, 42 M.J. 392, 396 (1995)(quoting *Reynolds*, 24 M.J. at 265). This test is applied from the viewpoint of the reasonable person. *Id.*

On the basis of the entire record, we have little doubt, despite his improper questioning of Private Baumert and his denial of the civilian defense counsel's request for an Article 39(a) session, that a reasonable person would conclude that the military judge conducted this general court-martial fairly and impartially. *See Ramos*, 42 M.J. at 396. Likewise, we have little doubt that there was no prejudice to the substantial rights of the appellant. Art. 59(a), UCMJ, 10 U.S.C. § 859(a). Although the military judge had let the proverbial "cat out of the bag," and the defense counsel was scrambling in a damage control mode, we note that it was he who asked the question which resulted in the members knowing that his client had engaged in trafficking in cocaine. Record at 196. The military judge, to his credit, had tried to avoid developing the details of the prior transaction. Record at 192.

■ Moreover, we conclude that the appellant failed to preserve this error for appellate review. We note that the civilian counsel never objected to any of the questions the judge posed nor to the instructions he provided to the members.[7] Absent plain error, which we do not find on these facts, the appellant's failure to raise these issues at trial forfeited them on appeal. *United States v. Olano*, 507 U.S. 725, 732–34, 113 S.Ct. 1770, 1776–78, 123 L.Ed.2d 508 (1993). *See*

MIL. R. EVID. 103(d). To prevail on appeal under the *Olano* "plain error" standard, the appellant "bears the burden of persuasion with respect to prejudice." *Id.* at 734, 113 S.Ct. at 1778. *See United States v. Young*, 470 U.S. 1, 16 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 ("[F]ederal courts have consistently interpreted the plain-error doctrine as requiring an appellate court to find that the claimed error ... had an unfair prejudicial impact on the jury's deliberations ... [which] undermined the fairness of the trial and contributed to a miscarriage of justice.").

In this case, we can find no such prejudice. The other evidence establishing the appellant's guilt was overwhelming. This included the direct examination of Private Baumert, which the NCIS agent corroborated, as well as the appellant's own testimony and confession. *See* Record at 307–37; Prosecution Exhibit 4. We also perceive no prospect whatsoever that the appellant's contrived entrapment defense would have prevailed, even if the members had never heard of the July 1994 transaction and the judge had asked no questions at all. Discussing the typical criminal prosecution involving a controlled buy of contraband drugs, the Supreme Court observed in 1992, "the entrapment defense is of little use because the ready commission of the criminal act amply demonstrates the defendant's predisposition." *Jacobson*, 503 U.S. at 550, 112 S.Ct. at 1541 (dictum). In this case, the appellant admitted, in both his confession and testimony, to having engaged in three sales of drugs over a period of a few weeks. We have no doubt that the members would have convicted the appellant even in the absence of the testimony of which he now complains. Given the incredible defense and the overwhelming evidence of guilt, the military judge's errors did not come close to undermining the fairness of the trial or contributing to a miscarriage of justice.

---

7. The appellant argues that we should construe the civilian defense counsel's request for an Article 39(a) session as an objection to the military judge's line of question; however, we decline to do so. The proper manner in which to file an objection is well known. If he had wanted "[t]o avoid an in-court confrontation [with the military judge in front of the members], counsel should [have made] such an objection at a sidebar conference or [at the next] Article 39(a) session." FRANCIS A. GILLIGAN & FREDRIC I. LEDERER, COURT-MARTIAL PROCEDURE § 14–63.30 (1991).

Therefore, although the military judge erred, we conclude that the appellant is entitled to no relief.

### Denial of Challenges for Cause

In his next two assignments of error, the appellant claims that the military judge erred in denying his two challenges for cause of Major Liber and Lieutenant Colonel Rudder. Record at 102–03. The defense then used its peremptory challenge on Lieutenant Colonel Rudder. Record at 136. Although the civilian defense counsel did not state that he would have used the peremptory challenge to challenge anyone else on the panel had his challenge for cause against Lieutenant Colonel Rudder been granted, we will assume that he would have used it against Major Liber. Therefore, despite his apparent failure to comply with the precise wording of R.C.M. 912(f)(4), we believe that he preserved the issue of the correctness of the military judge's ruling with respect to both members. *See United States v. Jobson,* 31 M.J. 117, 120 (C.M.A.1990).

■ Turning to the merits of the appellant's argument, we recognize that military judges are to grant challenges for cause liberally to ensure that the accused is tried by court members who are impartial as to findings and sentencing. *Jobson,* 31 M.J. at 122 (Sullivan, J. concurring); *see United States v. Glenn,* 25 M.J. 278, 279 (C.M.A.1987)("challenges for cause are to be liberally granted."); *Reynolds,* 23 M.J. at 294. At the same time, appellate courts must

> give a military judge great deference because we recognize that he has observed the demeanor of the participants in the voir dire and challenge process. Because we give the military judge great deference, we will overturn his ruling on a challenge only if we find a clear abuse of discretion.

*United States v. White,* 36 M.J. 284, 287 (C.M.A.1993), *cert. denied,* 510 U.S. 1090, 114 S.Ct. 918, 127 L.Ed.2d 212 (1994). The question of whether a member can serve impartially "is essentially one of credibility, and therefore largely one of demeanor." *Patton v. Yount,* 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984). "Due to his superior position, the military judge's determination of bias is entitled to great deference

on appeal and will not be reversed absent a clear abuse of discretion." *Reynolds,* 23 M.J. at 294.

Although the MANUAL FOR COURTS-MARTIAL enumerates a number of automatic reasons for excusing a member for cause, R.C.M. 912(f)(1)(A)–(M), the single most important ground for causal challenges is the so-called "catch-all," R.C.M. 912(f)(1)(N). That Rule provides that a "member shall be excused for cause whenever it appears that the member .... [s]hould not sit as a member in the interest of having the court-martial free from substantial doubt as to legality, fairness, and impartiality." *Id.* This ground for challenge covers situations where the member, *inter alia,* "is closely related to . . . a counsel . . . in the case; . . . has a decidedly friendly or hostile attitude toward a party; or has an inelastic opinion concerning an appropriate sentence for the offenses charged." *Id.,* Discussion. R.C.M. 912(f)(3) provides that the "burden of establishing that grounds for a challenge exist is upon the party making the challenge."

■ The appellant urges us to find that the military judge abused his discretion in denying the challenge for cause of Major Liber on the basis that he had a frequent working relationship with the trial counsel and had expressed a personal belief that the urinalysis program was quite reliable. Likewise, he asks that we find an abuse of discretion with respect to the denial of his challenge for cause of Lieutenant Colonel Rudder, who had been an initial review officer and thus associated with the base legal system. This court has held that a military judge abuses his discretion when he bases his ruling on manifestly incorrect grounds or when he fails to inquire sufficiently about the possible bias of a member. *United States v. Baum,* 30 M.J. 626, 629 (N.M.C.M.R.1990). The military judge in this case gave both counsel full opportunity to question the potential members as to all bases for possible excusal. Moreover, he had no difficulty approving a challenge for cause against Lieutenant Colonel Balawka. Record at 124.

After receiving candid answers from Major Liber and Lieutenant Colonel Rudder during voir dire, he and the trial counsel were able to rehabilitate these two officers such that the military judge was confident that they could be fair and impartial. In ruling on the challenges, the military judge made specific findings of fact with respect to each officer. Record at 126–28, 130–31. After carefully reviewing the voir dire process in its entirety, we are confident that the military judge did not abuse his discretion in making his rulings.[8]

Therefore, these two assignments of error are without merit.

### Inappropriately Severe Sentence

■ The appellant next contends that his sentence, which includes an unsuspended dishonorable discharge, is inappropriately severe. We note that the appellant was convicted of distributing methamphetamine on four occasions on board a military installation in increasingly large quantities. He was also convicted of two specifications of using methamphetamine on divers occasions. The traffic in and use of illegal drugs by military personnel is a scourge on combat readiness, professionalism, and reputation. The appellant willingly involved himself in that sordid trade. Despite his otherwise good record, we cannot agree that the sentence is inappropriately severe. Art. 66(c), UCMJ, 10 U.S.C. § 866(c).

We note that the convening authority granted the appellant a measure of relief on his adjudged sentence, suspending all but 8 years of his confinement. Additional sentence relief at this level would constitute clemency, a power which falls within the sole province of the convening authority. *United States v. Healy*, 26 M.J. 394, 395–96 (C.M.A. 1988); *see* R.C.M. 1107(b). Therefore, this assignment of error is without merit.

### Failure to Serve the Staff Judge Advocate's Addendum on the Defense Counsel

■ In his final assignment of error, the appellant contends that the addendum to the staff judge advocate's (SJA) recommendation contained "new matter," and therefore he should have been given an opportunity to review and comment upon it. R.C.M. 1106(f)(7) states that whenever "new matter is introduced [into an addendum] after the accused and counsel for the accused have examined the recommendation, ... the accused and counsel for the accused must be served with the new matter and given 10 days from service of the addendum in which to submit comments." *See also United States v. Jones*, 44 M.J. 242, 243 (1996); *United States v. Narine*, 14 M.J. 55, 56 (C.M.A.1982).

After careful consideration, we conclude that the SJA's reference to *United States v. Ramos*, 42 M.J. 392 (1995), did not include discussion of the effect of a "new decision" on issues in the case. *See* R.C.M. 1106(f)(7), Discussion. Our superior court decided *Ramos* on 14 September 1995, 3 full months before the appellant's attorney submitted his request for clemency. Moreover, the import of that case was not revolutionary, but merely restated long-standing principles on the proper role of the military judge at courts-martial. *See Reynolds*, 24 M.J. at 264–65. Rather, we believe that the SJA's remarks merely constituted a "discussion ... of the correctness of the initial defense comments on the recommendation." R.C.M. 1106(f)(7), Discussion. Although obviously a more recent case, *Ramos* was no more "new matter" than the other cases the SJA cited in support of his legal argument. While the SJA may have been well advised to have gone the

---

**8.** Although not raised as an assignment of error, we note that the trial counsel exercised his peremptory challenge against Second Lieutenant Douglas, USMC, the panel's only non-white member. While the challenged panel member was apparently not of the same race as the appellant, *see United States v. Moore*, 28 M.J. 366, 368 (C.M.A.1989)(adopting a *per se* rule requiring a racially neutral explanation whenever the Government uses a peremptory challenge against a member of the accused's race), the civilian defense counsel was concerned and requested an explanation. Record at 132. The military judge accepted the trial counsel's answer that the officer in question was the most junior and the least experienced member of the panel, both highly plausible, racially-neutral justifications. Record at 134–35. Based on the Supreme Court's decision in *Batson v. Kentucky*, 476 U.S. 79, 98–99, 106 S.Ct. 1712, 1723–25, 90 L.Ed.2d 69 (1986), this was fully sufficient for this peremptory challenge to pass constitutional muster.

extra mile and served this addendum on the appellant and his counsel, *United States v. Leal,* 44 M.J. 235–37 (1996)(suggesting that SJA's should "liberally construe the term 'new matter.'"), he had no legal obligation to provide it to the appellant before the convening authority took his action. Therefore, this final assignment of error is also without merit.

### Conclusion

Accordingly, after a careful review of the entire record, we affirm the findings and the sentence, as approved on review below.

Senior Judge KEATING and Senior Judge CLARK concur.

### APPENDIX

Questions by the military judge:

Q: Private Baumert, I have several questions. First of all, how do you spell Nobbee's name?

A: N-O-B-B-E-E, I presume, sir.

Q: When you knew him in December where was he assigned?

A: To Fox Company.

Q: 2d Battalion, 5th Marines.

A: Yes, sir.

Q: And did he have a first name?

A: I can't remember, sir.

Q: Did he have a nickname?

A: No, sir.

Q: Did he have a rank?

A: He was a Lance Corporal, sir.

Q: Now, I'm going to make sure that I have your version straight here about your initial contacts with Lance Corporal Acosta here. Is it your testimony that the first time, or at least in December, the first time you had any dealings with the accused concerning drugs was when you went to make an effort to buy drugs on behalf of Nobbee?

A: Yes, sir.

Q: No, from your own personal knowledge back in December, was there anything that you knew about the accused that prompted you to go to him to buy crystal methamphetamine?

A: I heard rumors of that.

Q: It was merely rumors?

A: Yes, sir.

Q: So can you recall with any more precision when in December you approached Lance Corporal Acosta about buying methamphetamine?

A: No, sir. In late December.

Q: You think it was in late December?

A: Before NIS or—before NIS, sir.

Q: Before you made any contact with NIS?

A: Early December.

Q: Well before the Christmas holidays?

A: I'm pretty sure it was, sir.

Q: Where did the funds come from for this transaction?

A: Lance Corporal Nobbee.

Q: And what did you do after you got the money?

A: I brought it back to Nobbee.

Q: Okay. Well, you got funds from Nobbee?

A: Check, sir.

Q: And was this in the F Company area?

A: Yes, sir.

Q: And then where did you go with the money?

A: To Lance Corporal Acosta's room.

Q: And what unit was he a member of at the time?

A: Weapons Company, 2/5.

Q: And what happened when you went to his room?

A: He was there.

Q: Then what happened?

A: I gave him the money and he gave me the drugs.

Q: And was this the first time that you'd ever purchased drugs from the accused?

A: No, it wasn't, sir.

Q: Did you do it later?

A: Purchase again, sir?

Q: Well,—okay. Later, of course, you testified you purchased drugs from him.

A: Yes, sir.

Q: Had you purchased drugs from him earlier?

A: Yes, sir.

Q: And when [w]as that?

A: It was right after we got back off ship, sir.

Q: When was that?

A: In July.

Q: In July of what year?

A: '95, sir.

Q: July of 1995?

A: '94, sir.

CC: Excuse me, Your Honor, if I could. Can we have a short 39(a), sir?

MJ: No. Sit down, Mr. Tranberg. You raised an issue of entrapment.

Questions by the military judge (continued):

Q: Now between July of 1994 and this early December timeframe how often had you purchased drugs from the accused?

A: Just one previous time.

Q: When you got back off ship?

A: Yes, sir.

Q: What role did that play in your going to visit him in December?

A: That's how I figured that he could get something.

Q: That's how you figured what?

A: That—I assumed that he could get more. If he got it that one time I assumed that he could get more.

Q: And so that's why you went to visit him?

A: Yes, sir.

Q: And had you discussed the fact that you'd [sic] paying a call on him in December?

A: No, sir.

Q: You just went to his room?

A: Yes, sir.

Q: And how long did it take you to purchase the methamphetamine?

A: The first time?

Q: Right.

A: The very first time I bought drugs off him?

Q: No, no, no. I'm talking about December.

A: December. Five minutes, sir.

Q: Was your visit unannounced—

A: No, sir.

Q: —or had you made a prearrangement?

A: He knew I was coming, sir.

Q: How did he know that?

A: I had talked to him before.

Q: In December.

A: Yes, sir.

Q: And what did you say?

A: I asked him if he knew where he could get any drugs and said most likely he could get it from home.

Q: And about when was this in relation to the purchase you say you made in December?

A: That was the purchase in December.

Q: And was it before that purchase that he told you that he could get drugs from home?

A: Yes. The one in July I don't know—

Q: I don't want to know anything more about that. Okay?

A: Yes, sir.

Q: Now, again, how much in advance did you make any arrangements for that transaction?

A: Two, three days, sir.

Q: Did you approach him or did he approach you?

A: I approached him.

Q: What did you say to him again?

A: I wanted to know if he thought he could get any drugs.

Q: What did he say?

A: He said most likely, I'll have to check at home.

Q: What happened next?

A: I left.

Q: Then what happened?

A: He found me a couple days—about two days later and said that he got something.

Q: Okay. Where did this take place?

A: I believe it was in the parking lot.

Q: And then what happened? .

A: I told him let me go get the money and then I'll meet you in your room.

Q: Now, it came to pass that you, to use the vernacular, popped positive for methamphetamine at some point in December?

A: Yes, sir.

Q: And who suggested, if anyone did, that you meet with Naval Criminal Investigative Service?

A: I don't know, sir.

Q: Who did you discuss the—well, let me ask you this: Who first suggested or was it your own idea that you think [sic] about cooperating with the NIS?

A: They came to me, sir.

Q: Who came to you?

A: Special Agent Harris.

Q: When and where did he do that?

A: At battalion, sir.

Q: This is outside of the company area up in the Battalion Headquarters?

A: Battalion Headquarters, sir.

Q: Were you asked to go up to the Battalion Headquarters?

A: Yes, I was, sir.

Q: And where did you go?

A: I was told to report to ConAd.

Q: ConAd?

A: Yes, sir.

Q: And then what happened when you arrived at ConAd?

A: Sergeant Barra, the legal chief, told me that two people wanted to talk to me.

Q: And who were those two people?

A: It was Special Agent Harris and another Special Agent.

Q: And what did they tell you?

A: They asked me if I knew why I was there and I said no and then they told me that I had popped positive on a urinalysis.

Q: And was that the first time you learned that you had popped positive?

A: Yes, sir.

Q: And then what sort of arrangement did they propose or what offer did they make?

A: They said they couldn't promise anything but the more people I brought down the better it would be for them to make a pitch to my command.

Q: And as a result you went out and at least you have testified that you set up the accused, Lance Corporal Acosta, three times in January and February; right?

A: Yes, sir.

Q: Did you attempt to do the same thing with respect to any other personnel?

A: No, sir. I tried one other person but he went UA.

Q: Now, did there come to pass a time when some arrangement was made between you, the NCIS and your command about what was going to happen as a result of your own drug offense in December.

A: I wasn't aware until they told me I was going to receive battalion NJP.

Q: Who told you this?

A: First I went for company NJP and my company commander said that this offense warrants battalion NJP so then he sent me to battalion NJP.

Q: Now I assume that you discussed with Special Agent Harris what sort of benefit you were going to get out of your cooperation; right?

A: I just asked him what he thought that he could for [sic] me.

Q: And what did he tell you?

A: He said he couldn't promise anything but maybe keep me out of the brig or keep it at battalion level. He didn't really know. All he could do was put in his best word. It was still up to the battalion to do what they thought fitting.

Q: And at some point I guess he made some sort of communication on your behalf to the battalion?

A: Yes, sir.

Q: Were you present when that happened?

A: No, I was not, sir.

Q: Did you know whether or not it was done in writing?

A: I don't know, sir.

Q: But is it your understanding that the outcome, in other words, the battalion NJP plus an administrative separation, no brig, no court-martial, that was basically the benefit that you're receiving for this?

A: I assume so, sir.

Q: Is that your assumption?

A: Yes, sir.

Q: Is that what you're acting on today?

A: Yes, sir.

Q: How many times were you searched before you made the so-called controlled buys in January and February?

A: Once before and once after.

Q: Were you searched all three times or just the later two times?

A: All three times, sir.

Q: Aside from the money going in what, if anything, were you allowed to take with you?

A: I just had my wallet, my keys and my dip can.

Q: Were those searched?

A: Yes, sir.

Q: All three times?

A: Yes, sir.

Q: Is your locker in the same area in the 62 area guard building as Lance Corporal Acosta's locker?

A: They're all in a squad bay.

Q: And was there a lock on your locker?

A: Yes, sir.

Q: What kind of lock was it?

A: It was a combination lock.

MJ: I don't have any further questions. Counsel, do you have any questions in light of mine?

TC: None from the government, Your Honor.

MJ: Mr. Tranberg.

[Record at 189–96.]