**Staff Sergeant Eleanor L. DEW, United States Army, Petitioner,**

v.

**UNITED STATES of America; and, Major General Walter B. Huffman, U.S. Army, The Judge Advocate General, Respondents.**

ARMY MISC. 9701700.
ARMY 9500382.

U.S. Army Court of Criminal Appeals.

23 April 1998.

For Petitioner: Captain Dirk Gifford, JA (argued); Captain Nathaniel J. Reitz, JA (on petition and brief); Captain Dirk Gifford, JA (argued); Colonel John T. Phelps II, JA; Lieutenant Colonel Michael L. Walters, JA; Major Leslie A. Nepper, JA (on brief).

For Respondents: Colonel Joseph E. Ross, JA (argued); Lieutenant Colonel Frederic L. Borch III, JA; Major Michael J. Klausner, JA, Captain Robert F. Resnick, JA (on brief).

Before the Court Sitting EN BANC.

## OPINION OF THE COURT AND ACTION ON PETITION FOR EXTRAORDINARY RELIEF IN THE NATURE OF A WRIT OF MANDAMUS AND A WRIT OF ERROR CORAM NOBIS

CAIRNS, Judge:

In a Petition for Extraordinary Relief in the Nature of a Writ of Mandamus and a Writ of Error Coram Nobis, petitioner asks this court to: (1) issue a writ of mandamus ordering The Judge Advocate General to set aside the findings and sentence or, alternatively, ordering him to send petitioner's court-martial to this court in accordance with Article 69(d), Uniform Code of Military Justice, 10 U.S.C. § 869(d)(1989) [hereinafter UCMJ], for further review under the provisions of Article 66, UCMJ, 10 U.S.C.A. § 866; or, (2) issue a writ of error coram nobis setting aside the findings and sentence.[1] Petitioner asserts she is entitled to extraordinary relief because: (1) the military judge erred by accepting her guilty plea in contravention of the public policy against enforcing gambling obligations as set forth in *United States v. Wallace,* 15 U.S.C.M.A. 650, 36 C.M.R. 148, 1966 WL 4432 (1966); and (2) The Judge Advocate General abused his dis-

cretion when reviewing petitioner's court-martial under Article 69, UCMJ. Because the court is evenly divided on whether to grant relief, we deny the petition.

### I. History of the Case

#### a. Factual Background

On 6 March 1995, a general court-martial found petitioner guilty, pursuant to her pleas, of five specifications of making and uttering worthless checks by dishonorably failing to maintain funds in violation of Article 134, UCMJ. A panel of officer and enlisted members sentenced her to be reduced from master sergeant, E8, to the grade of E4. On 16 July 1995, the convening authority approved only so much of the sentence as provided for reduction to the grade of E6.

The summarized record of trial appended to the petition reflects that petitioner was addicted to slot machine gambling. She cashed thirty-seven bad checks at the Fort Clayton, Panama, Noncommissioned Officer's (NCO) Club and Bowling Center and used all the proceeds from the bad checks to gamble in the slot machines. In her unsworn statement during the sentencing phase of her trial, petitioner stated that she gambled in the slot machines located in the NCO Club and the Bowling Center.

Of the thirty-seven bad checks, petitioner wrote thirty-five, for a total of $7,000.00, to the NCO Club over the course of thirty-five days. She cashed the other two checks at the Bowling Center. Although the NCO Club check-cashing facility which accepted petitioner's checks usually adhered to a $300.00 per day limit applicable to all patrons, petitioner cashed three checks at the NCO Club for a total of $450.00 on one date and two checks for a total of $600.00 on another date. While the record does not specifically address whether the cashier knew the petitioner had exceeded the limit on these two days, presumably they did not because petitioner stated under oath that only "[o]n a rare occasion, if I knew the teller at the NCO Club, sometimes I was able to

---

1. In her supplemental brief in support of the petition for extraordinary relief, petitioner makes no mention of her request that this court order The Judge Advocate General to send this case to us for review under Article 66, UCMJ. However, she adds a request that the court set aside the findings and sentence under Article 69(d)(2).

cash an additional check beyond the $300.00 limit, but they would always limit the amount of the check to approximately $25.00."

### b. Appellate History

On 30 August 1995, the record of trial was examined in the Office of The Judge Advocate General under the provisions of Article 69(a), UCMJ.[2] Pursuant to that review, the findings of guilty and the sentence were found to be supported in law.[3]

According to petitioner, sometime in 1996, she requested The Judge Advocate General to grant her relief under Article 69(b), UCMJ, but that request was denied because her case had been previously reviewed under Article 69(a), UCMJ.[4] On 12 December 1996, petitioner requested The Judge Advocate General to refer her case under Article 69(d), UCMJ,[5] to this court for appellate review of the providence of her pleas of guilty. From what we can determine, the crux of her request for relief was that, in view of *United States v. Allbery*, 44 M.J. 226 (1996)—a case decided after The Judge Advocate General's original Article 69(a) review—petitioner's guilty pleas were not provident because her bad checks were "written to an on-site gambling enterprise for the purpose of gambling there [and therefore] are not criminally enforceable as a matter of public policy."[6] In an action dat-ed 4 September 1997, The Judge Advocate General stated, "[B]oth the Petition and the original record of trial having been carefully reviewed, said Petition is hereby denied." Petitioner then filed her Petition for Extraordinary Relief in the Nature of a Writ of Mandamus and a Writ of Error Coram Nobis with our court on 21 November 1997. Petitioner presented two issues to this court:

### I.

WHETHER EXTRAORDINARY RELIEF IS WARRANTED IN LIGHT OF THE JUDGE ADVOCATE GENERAL'S INCORRECT LEGAL REVIEW OF PETITIONER'S COURT–MARTIAL UNDER ARTICLE 69(A), UCMJ, OR HIS FAILURE TO REFER PETITIONER'S COURT–MARTIAL TO THE ARMY COURT OF CRIMINAL APPEALS UNDER ARTICLE 69(D), UCMJ, OR BOTH.

### II.

WHETHER EXTRAORDINARY RELIEF IS WARRANTED IN A CASE NOT SUBJECT TO REVIEW UNDER ARTICLE 66(B), UCMJ, IN LIGHT OF POST–TRIAL CASE LAW ESTABLISHING THAT FACTS RAISED BY PETITIONER DURING THE FACTUAL IN-

---

2. Article 69(a), UCMJ, in pertinent part, provides for the appellate review of each general court-martial resulting in a conviction that is not otherwise reviewed by the Court of Criminal Appeals. The provision specifies that the record of trial:

 [S]hall be examined in the office of the Judge Advocate General.... If any part of the findings or sentence is found to be unsupported in law ... the Judge Advocate General may modify or set aside the findings or sentence or both. The examination generally involves only a summarized record of trial rather than a verbatim transcript. The accused is not represented by appellate defense counsel and no briefs or oral arguments are presented. In accordance with Article 38(c), UCMJ, however, the trial defense counsel "may forward for attachment to the record of proceedings a brief of such matters as he determines should be considered in behalf of the accused on review." Trial defense counsel also may identify legal issues that should be considered during the examination by highlighting them in the submissions provided to the convening authority under the provisions of Rule for Courts–Martial 1105, MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.) [hereinafter R.C.M.].

We note that the trial defense counsel in this case neither submitted an Article 38(c), UCMJ, brief nor raised any legal issues in his extensive clemency matters submitted under R.C.M. 1105.

3. *United States v. Dew*, ARMY 9500382 (30 Aug. 1995).

4. Under Article 69(b), UCMJ, courts-martial not reviewed under Articles 66 or 69(a), UCMJ, may be reviewed by The Judge Advocate General on the grounds specified by the statute.

5. Article 69(d) established a procedure for the Judge Advocates General to send courts-martial to the military appellate courts when the sentence was not subject to automatic review under Article 66, UCMJ, by those courts. The certification could take place either upon initial review of the court-martial or after formal review by the Judge Advocates General. *See* H.R. CONF. REP. No. 101–331 (1989), *reprinted in* 1989 U.S.C.C.A.N. 838, 977, 1115.

6. Petitioner's original Brief in Support of Petition for Extraordinary Relief, p. 3.

QUIRY AND STIPULATED TO BY THE GOVERNMENT WERE INCONSISTENT WITH HER GUILTY PLEA.

After reviewing the petition for extraordinary relief filed in our court, including pertinent portions of the record of trial, a panel of this court ordered the government to show cause why the extraordinary relief sought should not be granted. Counsel for the government filed a brief in opposition. A panel of this court heard oral argument on 3 December 1997.

On 30 January 1998, the court, on its own motion, decided to consider en banc the petition in this case. We specified three issues as follow:

### I.

WHETHER THIS COURT HAS JURISDICTION TO ENTERTAIN PETITIONER'S REQUEST FOR EXTRAORDINARY RELIEF. *SEE* UNIFORM MILITARY CODE [sic] OF JUSTICE art. 69(a) AND (d) AND UCMJ art. 76, 10 U.S.C. § 869 AND 876 (1988) [HEREINAFTER UCMJ]; 28 U.S.C. § 1651(a) (1997); *UNGER v. ZIEMNIAK,* 27 M.J. 349 (C.M.A.1989); *DETTINGER v. UNITED STATES,* 7 M.J. 216 (C.M.A. 1979); *McPHAIL v. UNITED STATES,* 1 M.J. 457 (C.M.A.1976); *UNITED STATES v. FRISCHHOLZ,* 16 U.S.C.M.A. 150, 36 C.M.R. 306, [1966 WL 4467] (1966); *DAVIS v. UNITED STATES,* 35 M.J. 640 (A.C.M.R.1992). *SEE ALSO [UNITED STATES v.] STEWART v. STEVENS,* 5 M.J. 220 [210] (C.M.A.1978); *LITTLETON v. PERSONS,* 7 M.J. 582 (A.C.M.R.1979); *SMITHEE v. VORBACH,* 25 M.J. 561 (C.G.C.M.R.1987); *ROGERS v. ST. GEORGE,* 6 M.J. 558 (N.M.C.M.R.1978).

### II.

IF THIS COURT HAS JURISDICTION TO ENTERTAIN PETITIONER'S REQUEST FOR EXTRAORDINARY RELIEF, WHAT IS THE STANDARD OF REVIEW? *SEE GARRETT v. LOWE,* 39 M.J. 293 (C.M.A.1994); *UNGER,* 27 M.J. 349 (C.M.A.1989); *UNITED STATES v. LABELLA,* 15 M.J. 228 (C.M.A.1983); *DETTINGER,* 7 M.J. 216 (C.M.A.1979); *McPHAIL,* 1 M.J. 457 (C.M.A.1976); *DAVIS,* 35 M.J. 640 (A.C.M.R.1992); *UNITED STATES v. MONTCALM,* 2 M.J. 787 (A.C.M.R.1976).

### III.

IF THIS COURT HAS JURISDICTION, DOES THIS CASE WARRANT RELIEF UNDER THE APPLICABLE STANDARD OF REVIEW? *SEE* UCMJ art. 45, 10 U.S.C. § 845 (1988); *UNITED STATES v. PRATER,* 32 M.J. 433 (C.M.A. 1991); *UNITED STATES v. CARE,* 18 U.S.C.M.A. 535, 40 C.M.R. 247 [1969 WL 6059] (1969); *UNITED STATES v. WALLACE,* 15 U.S.C.M.A. 650, 36 C.M.R. 148 [1966 WL 4432] (1966); *UNITED STATES v. LENTON,* 8 U.S.C.M.A. 690, 25 C.M.R. 194 [1958 WL 3111] (1958). *SEE ALSO UNITED STATES v. FAIRCLOTH,* 45 M.J. 172 (1996); *UNITED STATES v. ALLBERY,* 44 M.J. 226 (1996); *UNITED STATES v. GREENLEE,* [47] M.J. [613] (ARMY CT. CRIM. APP. 20 OCT 1997); *UNITED STATES v. GREEN,* 44 M.J. 828 (Army Ct.Crim.App. 1996); *UNITED STATES v. SLAUGHTER,* 42 M.J. 680 (Army Ct.Crim.App. 1995).

After filing additional briefs, the parties presented oral argument before the court sitting en banc on 4 March 1998.

The government contends that we may not issue the writ because Congress has given jurisdiction over petitioner's case to The Judge Advocate General exclusively. Government counsel assert that the jurisdiction of our court extends only to the cases we review under Article 66, UCMJ, and to courts-martial sent to us by The Judge Advocate General pursuant to Article 69(d), UCMJ. The government further contends that the case is final within the meaning of Article 76, UCMJ, and may not be further reviewed.

II. Whether this Court has Jurisdiction.

The court unanimously rejects the government's assertion that we have no jurisdiction to entertain this collateral attack by petition-

er of her final general court-martial conviction. Our jurisdiction is predicated upon the All Writs Act and our supervisory responsibility in the military justice system.

### a. Extraordinary Writ Authority

■ Congress established this court's appellate jurisdiction over cases in which the approved sentence extends to death, dismissal of a commissioned officer, cadet, or midshipman, dishonorable or bad-conduct discharge, or confinement for one year or more.[7] Article 66(b), UCMJ. As a consequence, based upon petitioner's approved sentence, this court never acquired appellate jurisdiction to hear this case on direct review. In addition to our ordinary appellate jurisdiction, however, it has been long recognized that this court has the authority to issue extraordinary writs under the All Writs Act when "necessary or appropriate in aid of [our] jurisdiction and agreeable to the usages and principles of law." 28 U.S.C. § 1651(a); *Dettinger v. United States*, 7 M.J. 216 (C.M.A.1979); *Kelly v. United States*, 1 M.J. 172 (C.M.A.1975); *Henderson v. Wondolowski*, 44 C.M.R. 117, 1971 WL 12462 (1971); *McKinney v. Jarvis*, 46 M.J. 870 (Army Ct. Crim.App.1997); *United States v. Draughon*, 42 C.M.R. 447, 1970 WL 7129 (A.C.M.R. 1970). The All Writs Act "expressly declares and recognizes the existence of ancillary authority which all courts possess as an incident of their existence as a court to protect their respective jurisdictions otherwise conferred." *Draughon*, 42 C.M.R. at 450–51. Since Congress conferred our appellate jurisdiction in Articles 62, 66, and 69, UCMJ, the All Writs Act explicitly recognizes our authority to grant extraordinary relief "in aid" of that statutory jurisdiction.[8]

■ This court may exercise extraordinary writ authority in aid of our actual or potential jurisdiction. Under Article 69, UCMJ, certain cases are reviewed within the Office of The Judge Advocate General, and Congress has specifically provided for our appellate review of these cases under circumstances prescribed by Article 69, UCMJ. Our potential jurisdiction over this type of case provides a basis for entertaining a writ "in aid of jurisdiction" under the All Writs Act. *Addis v. Thorsen*, 32 M.J. 777 (C.G.C.M.R.1991).[9]

### b. Supervisory Jurisdiction

■ Our authority to issue extraordinary writs "in aid of jurisdiction" under the All Writs Act is not limited to our actual or potential appellate jurisdiction defined in Articles 62, 66, and 69, UCMJ, 10 U.S.C.A. §§ 862, 866, 869. *See McPhail v. United States*, 1 M.J. 457, 462 (1976). These statutory provisions do not encompass our entire authority as a court. As the highest judicial tribunal in the Army's court-martial system, we are expected to fulfill an appropriate supervisory function over the administration of military justice. *Noyd v. Bond*, 395 U.S. 683, 693–98, 89 S.Ct. 1876, 1882–85, 23 L.Ed.2d 631 (1969). The concept of supervisory jurisdiction as support for extraordinary writ authority under the All Writs Act has developed primarily in cases decided by our superior court, the United States Court of Military Appeals (now the United States Court of Appeals for the Armed Forces) [hereinafter Court of Appeals]. In *McPhail*, Judge Cook, writing for a unanimous Court of Appeals, observed:

> In *Gale v. United States*, 17 U.S.C.M.A. 40, 43, 37 C.M.R. 304, 307 [1967 WL 4245] (1967), the Court remarked that its earlier

---

7. Congress has also conferred upon this court jurisdiction to hear certain government appeals (Article 62, UCMJ) and to review courts-martial which do not qualify under Article 66, UCMJ, when sent to us by The Judge Advocate General (Article 69(d), UCMJ).

8. *See also United States v. Frischholz*, 16 U.S.C.M.A. 150, 36 C.M.R. 306, 308, 1966 WL 4467 (1966) ("The All Writs Act merely makes 'explicit the right to exercise powers implied from the creation of such courts.'") (citations omitted).

9. Potential appellate jurisdiction includes cases in which the potential jurisdiction is attenuated and dependent upon the discretionary acts of others who exercise authority in the military justice system. *See United States Navy–Marine Corps. Court of Military Review v. Carlucci*, 26 M.J. 328, 333 (C.M.A.1988) (Extraordinary writ authority supported by "potential appellate jurisdiction" where petitioner sought to enjoin an investigation ordered by superior authority, the potential disobedience of which could subject petitioner to court-martial prosecution).

opinion in *United States v. Frischholz*, 16 U.S.C.M.A. 150, 36 C.M.R. 306 [1966 WL 4467] (1966), "unequivocally declared our jurisdiction extended beyond the ordinary appellate review of courts-martial." Without reference to the kinds of courts-martial involved in its appellate jurisdiction, the Court went on to say that, as the supreme civilian court of the military justice system, it could not imagine that it lacked authority to grant "relief on an extraordinary basis, when the circumstances so require." 1 M.J. at 460 (quoting *Gale*, 17 U.S.C.M.A. at 43, 37 C.M.R. at 307). Concluding that its authority to issue writs in aid of its jurisdiction was not limited to the appellate jurisdiction defined in Article 67, UCMJ, the *McPhail* court stated:

[T]his Court is the supreme court of the military judicial system. To deny that it has authority to relieve a person subject to the Uniform Code of the burdens of a judgment by an inferior court that has acted contrary to constitutional command and decisions of this Court is to destroy the 'integrated' nature of the military court system and to defeat the high purpose Congress intended this Court to serve. Reexamining the history and judicial applications of the All Writs Act, we are convinced that our authority to issue an appropriate writ in "aid" of our jurisdiction is not limited to the appellate jurisdiction defined in Article 67.

1 M.J. at 462. Thus, the court exercised its writ authority over a case which, based upon the approved sentence, could not have been considered under the court's ordinary appellate jurisdiction under Article 67, UCMJ.[10]

In *Unger v. Ziemniak*, 27 M.J. 349 (1989), the Court of Appeals exercised its extraordinary writ authority when it considered a petition brought by an officer who faced trial by special court-martial. Because a special court-martial has no authority to dismiss an officer or sentence an officer to confinement, "there would seem to be no way that a conviction of an officer by a special court-martial would qualify for review by [the United States Court of Military Appeals] under Article 67(b), UCMJ." *Unger*, 27 M.J. at 351. In an opinion that chronicles the development of extraordinary writ jurisdiction in the military justice system, the court confirmed its "All–Writs–Act supervisory jurisdiction" over cases outside its actual or potential appellate jurisdiction when the court-martial proceedings violate the rights of service personnel under the Constitution or Uniform Code of Military Justice. "Congress never intended that this Court sit by helplessly while courts-martial are misused in disregard of an accused servicemember's rights under the Constitution or the Uniform Code." *Unger*, 27 M.J. at 355.

Some years ago, the Court of Appeals sustained the jurisdiction of the service Courts of Military Review to issue extraordinary writs under the All Writs Act based upon their supervisory authority "over the actions of trial judges in cases that may potentially reach the appellate court[s]." *Dettinger*, 7 M.J. at 220. More recently, in a case strikingly similar to the case at bar, we relied upon our supervisory jurisdiction when we entertained a petition for extraordinary relief in a general court-martial that had been reviewed in the Office of The Judge Advocate General under Article 69(a), UCMJ. *Davis v. United States*, 35 M.J. 640 (A.C.M.R.1992). Although we denied the writ, we concluded that the Court of Appeals' decision in *Unger* had overruled the line of cases that held authority under the All Writs Act did not extend to Article 69, UCMJ, cases. *See, e.g., Littleton v. Persons*, 7 M.J. 582 (A.C.M.R.1979); *Barnett v. Persons*, 4 M.J. 934 (A.C.M.R.1978).[11]

---

10. In fact, the posture of the case in *McPhail* was similar to that in this case. In *McPhail*, petitioner had been convicted by a general court-martial. Because the sentence did not meet the statutory threshold for review by the Air Force Court of Military Review, the case was reviewed in the Office of The Judge Advocate General of the Air Force. After that office found the case legally sufficient, McPhail petitioned the Court of Appeals for relief. 1 M.J. 457.

11. At least two other service courts apparently agree with our view. *See Addis*, 32 M.J. 777 (C.G.C.M.R.1991); *San Antonio Express-News v. Morrow*, 44 M.J. 706 (A.F.Ct.Crim.App.1996). *See also Smithee v. Vorbach*, 25 M.J. 561 (C.G.C.M.R.1987).

In applying *McPhail, Unger, Dettinger, Davis,* and related cases, we need not define the outer limits of our supervisory jurisdiction in order to dispose of the petition before us. Certainly, we will not force soldiers to bring collateral attacks of their courts-martial in the civilian federal courts or the U.S. Court of Appeals for the Armed Forces. We hold that this court has "All–Writs–Act supervisory jurisdiction" to consider, on the merits, a writ challenging the action taken under Article 69, UCMJ, in the Office of The Judge Advocate General with regard to this general court-martial. *Unger,* 27 M.J. at 353.

### c. Finality

■ The government contends that the petitioner's court-martial was "final and conclusive" under the provisions of Article 76, UCMJ,[12] once it was reviewed under Article 69(a), UCMJ. Consequently, it may not be further reviewed.

The finality provisions contained in Article 76, UCMJ, were never intended to preclude all collateral attacks.[13] The Court of Appeals in *Frischholz,* 36 C.M.R. at 307, stated that Article 76 "does not insulate a [court-martial] conviction from subsequent attack in an appropriate forum." In *Hendrix v. Warden,* the court said:

> Finalization of proceedings under Article 76, UCMJ, not only terminates the appellate processes of courts-martial, it also terminates this Court's jurisdiction of the case, *except in circumstances contemplated by 28 U.S.C. § 1651(a)* [i.e., The All Writs Act].

23 U.S.C.M.A. 227, 228, 49 C.M.R. 146, 147, 1974 WL 14026 (1974) (footnotes omitted) (emphasis added).

Collateral attack has long been available to review military judgments to ensure they pass constitutional muster. *See Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975) (judgments of the military court system remain subject in proper cases to collateral impeachment). As the United States Supreme Court stated, "it must be assumed that the military court system will vindicate servicemen's constitutional rights." *See Schlesinger,* 420 U.S. at 758, 95 S.Ct. at 1313.

Although additional review of a general court-martial examined under Article 69(a), UCMJ, may raise issues concerning finality, further action on a case by The Judge Advocate General in accordance with Article 69, UCMJ, has long been regarded as an exception to finality under Article 76, UCMJ.[14] A specific exception to finality was provided by Congress in the 1989 amendments to Article 69, UCMJ. That legislation created Article 69(d), UCMJ, a section that provides for appellate review by our court of courts-martial normally reviewed by The Judge Advocate General, including cases already reviewed by him. That provision is explicit legislative recognition that Article 76, UCMJ, does not preclude additional review.

Lastly, we note that a writ of error coram nobis is a longstanding exception to the finality rule contained in Article 76, UCMJ. *See Garrett v. Lowe,* 39 M.J. 293 (C.M.A.1994); *Del Prado v. United States,* 23 U.S.C.M.A. 132, 48 C.M.R. 748, 1974 WL 13907 (C.M.A. 1974); *Tillman v. United States,* 32 M.J. 962 (A.C.M.R.1991); *Chapel v. United States,* 21 M.J. 687 (A.C.M.R.1985). Thus, we hold that Article 76, UCMJ, does not preclude our examination of petitioner's court-martial to determine whether the issues she has raised in her petition received full and fair consideration at trial and during review in the Office of The Judge Advocate General.

---

**12.** Article 76, UCMJ, generally provides that the appellate review of records of trial and the findings and sentences of courts-martial as reviewed or affirmed are "final and conclusive."

**13.** The drafters of the provision recognized that decisions otherwise final under Article 76, UCMJ, were subject to a petition for a writ of habeas corpus. *See* S.Rep. No. 81–486, (1949) [hereinafter S.Rep. No. 81–486], *reprinted in* 1950 U.S.C.C.A.N. 2222.

**14.** The Military Justice Act of 1968 amended Article 69, UCMJ, and gave the Judge Advocates General explicit authority to vacate a finding in a court-martial otherwise reviewed under Article 69, on the basis of error prejudicial to the substantial rights of an accused "[n]otwithstanding section 876 of this title ([A]rticle 76)." *See* Military Justice Act of 1968, Pub.L. No. 90–632, § 30, 82 STAT. 1335 (1968), *reprinted in* 1968 U.S.C.C.A.N. 1570.

### III. What Criteria are Required for Extraordinary Relief?

 Although we have concluded that the court has jurisdiction to consider the petition, we must decide what criteria apply in determining whether extraordinary relief should be granted.[15] At the outset, we believe it is axiomatic that one who seeks a writ must present truly extraordinary matters justifying the requested extraordinary relief. *See McKinney*, 46 M.J. 870. Under our All–Writs–Act supervisory jurisdiction, a petitioner must present compelling reasons why it is "necessary and appropriate" that we grant relief. Issuance of a writ constitutes a "drastic instrument which should be invoked only in truly extraordinary situations." *United States v. Labella*, 15 M.J. 228, 229 (C.M.A.1983). *See generally Murray v. Haldeman*, 16 M.J. 74 (C.M.A.1983); *Aviz v. Carver*, 36 M.J. 1026, 1028 (N.M.C.M.R. 1993); *Pearson v. Bloss*, 28 M.J. 764, 766 (A.F.C.M.R.1989). Because of their extraordinary nature, writs are issued sparingly, and a petitioner bears an extremely heavy burden to establish a clear and indisputable entitlement to extraordinary relief. *McKinney*, 46 M.J. at 873. *See also Bankers Life and Casualty Co. v. Holland*, 346 U.S. 379, 384, 74 S.Ct. 145, 148–49, 98 L.Ed. 106 (1953). With these general principles in mind, we will examine what criteria justify extraordinary relief under each theory— mandamus and coram nobis—and whether the petitioner has met the prerequisites for relief under either writ.

#### a. Writ of Mandamus

 Mandamus is a preemptory writ traditionally used "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so." *Roche v. Evaporated Milk Association*, 319 U.S. 21, 26, 63 S.Ct. 938, 941, 87 L.Ed. 1185 (1943). Mandamus does not provide this court with unbridled authority "to do justice"—as we might perceive it—by ordering inferior courts, officers, and commanders to conform their actions to our opinion of how they should perform their respective duties. Quoting Supreme Court precedent, our superior court has observed, "Mandamus . . . does not 'run the gauntlet of reversible errors.' . . . *Its office is not 'to control the decision of the trial court,'* but . . . to confine . . . [it] to the sphere of its discretionary power." *Dettinger*, 7 M.J. at 218 (emphasis added).

 Mandamus is a drastic remedy that should only be invoked in truly exceptional circumstances. *Will v. United States*, 389 U.S. 90, 95, 88 S.Ct. 269, 273–74, 19 L.Ed.2d 305 (1967); *Labella*, 15 M.J. 228; *Porter v. Eggers*, 32 M.J. 583 (A.C.M.R.1990). We are not free to substitute our own judgment for that of the trial judge or The Judge Advocate General. *Porter*, 32 M.J. at 584. Instead, we may only decide whether either erred by exceeding its authority in a ruling or decision that is contrary to statute, settled case law, or valid regulation. *McKinney*, 46 M.J. at 874; *Porter*, 32 M.J. at 584. If we conclude there was error, before granting such drastic relief as mandamus we must be satisfied that the erroneous discretionary decision amounted "to more than even 'gross error'; it must amount to 'a judicial "usurpation of power," ' . . . or be 'characteristic of an erroneous practice which is likely to recur.' " *Murray*, 16 M.J. at 76 (citations omitted); *Labella*, 15 M.J. at 229. *See also Will*, 389 U.S. at 95, 88 S.Ct. at 273–74.

 At least two federal circuits have synthesized guidelines designed to frame the boundaries of their mandamus power. The guidelines, referred to as the "*Bauman* factors," are as follows:

(1) The party seeking relief has no other adequate means, such as direct appeal, to attain the relief desired;

(2) The petitioner will be damaged or prejudiced in a way not correctable on appeal;

---

**15.** In our second specified issue, we asked what "standard of review" applied. Because mandamus and coram nobis are collateral attacks based on extraordinary circumstances, we now believe that identifying "criteria for relief" more aptly describes this step in our analysis. We see value in using a different label than "standard of review," a term ordinarily used in the direct appeal process.

(3) The lower court's order is clearly erroneous as a matter of law;

(4) The lower court's order is an oft-repeated error, or manifests a persistent disregard of federal rules;

(5) The lower court's order raises new and important problems, or issues of law of first impression.

*In re American Medical Systems, Inc.*, 75 F.3d 1069, 1078 (6th Cir.1996); *Bauman v. United States District Court*, 557 F.2d 650, 654–55 (9th Cir.1977). Petitioners need not satisfy all the *Bauman* factors; rather, they are intended to be balanced by the courts. Consequently, their application will not always yield definitive results. Not all the factors are relevant in every case, and rarely will they all point to the same conclusion. However, they provide a framework for principled analysis beyond the generally accepted criteria set forth in the previous paragraph.

### b. Coram Nobis

■ The petitioner requests that the findings and sentence be set aside pursuant to her writ of error coram nobis. Coram nobis is neither a substitute for ordinary appeal nor a device to restart the appellate process. *Nkosi v. Lowe*, 38 M.J. 552 (A.F.C.M.R.1993). It is an extraordinary remedy predicated on exceptional circumstances not apparent to the court in its original consideration of the case. *Frischholz*, 36 C.M.R. at 309. Under long-standing precedent of this court, coram nobis "involves no more than a court reconsidering its own acts to avoid a miscarriage of justice." *Draughon*, 42 C.M.R. at 453.

■ "Under coram nobis, a court can remedy an earlier disposition of a case that is flawed because the court misperceived or improperly assessed a material fact." *McPhail*, 1 M.J. at 459. The burden is upon the petitioner to establish that the matter was unknown to him, and not apparent to the court, at the time the court first considered the case. Although at one time errors of law were thought not to be cognizable under coram nobis, the current view in military practice is that the writ "appears to encompass constitutional and *other fundamental errors.*" *Garrett*, 39 M.J. at 295 (citing S. Childress and M. Davis, Federal Standards of Review § 13.01 at 13–2 (2d ed. 1992) (emphasis in original)). The error must be so fundamental as to render the proceedings themselves irregular and invalid. *Chapel*, 21 M.J. 687. Because society has a strong interest in the finality of appeals, our superior court has stated:

> [T]he standard for obtaining relief through a writ of error coram nobis is more stringent than the standard applicable on direct appeal. As a result, an error which would justify relief during normal appellate review will not necessarily trigger coram nobis relief.

*Chapel*, 21 M.J. at 689 (citations omitted).

■ This court previously adopted the following criteria for coram nobis relief, and, in so doing, held that the petitioner bears the heavy burden to establish that:

(1) an error had been made that was unknown to him during appeal;

(2) a more usual remedy is unavailable;

(3) valid reasons exist for not previously attacking the conviction; and

(4) the error was of such a fundamental nature as to render the proceedings irregular and invalid.

*Tillman*, 32 M.J. at 965 (citations omitted).

### IV. Whether Petitioner is Entitled to Relief.

To decide whether petitioner is entitled to relief, we must first decide whether the military judge committed the error petitioner alleges. If the military judge erred, we must then evaluate the magnitude of the error, examine the actions of The Judge Advocate General, and apply the criteria for mandamus and coram nobis relief.

Petitioner argues that her pleas of guilty to bad checks written to the NCO Club and the Bowling Center should not have been accepted because all proceeds were used to gamble at on-site slot machines.[16] Petitioner

---

16. We note that petitioner raised the issue of the providency of her pleas for the first time after the Article 69(a), UCMJ, review was completed.

asserts that military case law precluded, as a matter of public policy, the imposition of criminal sanctions for checks issued in connection with gambling. We will first examine the substantive law that existed at the time of trial, as well as at the time critical decisions were made during post-trial review under Article 69, UCMJ.

### a. Substantive Law

■■■ At the time this case was tried, military law held that public policy precluded the use of criminal sanctions to enforce gambling debts. *United States v. Walter,* 8 U.S.C.M.A. 50, 23 C.M.R. 274, 1957 WL 4479 (1957). Although the public policy protection has been applied to bad check offenses, not every check transaction between gambling participants can be considered to be part of the game.

> One player may ask another to cash a check, and when the request is honored he may pocket the proceeds without using any of it in the game.... In such a situation, the check transaction is entirely separate from the gambling activity.

*United States v. Lenton,* 8 U.S.C.M.A. 690, 25 C.M.R. 194, 197, 1958 WL 3111 (1958). Therefore, "[t]he critical question in these cases is whether the alleged act of misconduct is part of, or separate from, participation in the ... game." *Id.*

In *United States v. Wallace,* the Court of Appeals applied the *Walter* and *Lenton* principles to a "record [that] disclose[d] a truly astonishing situation." 15 U.S.C.M.A. 650, 36 C.M.R. 148, 149, 1966 WL 4432 (1966). Major Wallace purchased rolls of quarters by cash, check, or IOU from the Officer's Club to play the club's slot machines. Major Wallace was so fascinated with playing the slot machines that the club manager described his uncontrollable gambling as "donations" to the club. Major Wallace redeemed his outstanding IOUs at the end of each evening with a check. When his checks were dishonored, the club billed his monthly club account. Even when checks he wrote in payment of his bill were returned for insufficient funds, he was allowed simply to write more checks. These circumstances continued with the knowledge and approval of the Club's Board of Governors, on which Major Wallace sat as a member. Concluding that the checks were written to facilitate the play of the club's gambling devices, and therefore not entirely separate from the gambling activity, the court held:

> Whether gaming is legal or illegal, transactions involving the same or designed to facilitate it are against public policy, and the courts will not lend their offices to enforcement of obligations arising therefrom.

*Id.* The degree of the club's involvement in Major Wallace's gambling activity was critical to the court's conclusion that the checks were issued *as part of a gambling transaction.* The club's involvement included providing rolls of quarters maintained on hand for patrons to use in the slot machines, as well as the knowledge and approval of the club's management—which extended to loans by means of checks and otherwise—of Major Wallace's use of checks for gambling.

The principles established in *Walter, Lenton,* and *Wallace* applied at the time of petitioner's trial and continue to be viable in military practice today. *See Allbery,* 44 M.J. 226 (1996); *United States v. Woodcock,* 39 M.J. 104 (1994).

### b. Providence of the Guilty Plea

■■■ If an accused sets up a matter at trial that is inconsistent with his guilty plea, the military judge must inquire further and either resolve the inconsistency or reject the plea. UCMJ art. 45(a); *United States v. Garcia,* 44 M.J. 496 (1996).[17] On direct appeal, unless the appellate court finds a substantial conflict between the plea and the asserted inconsistent matter, the court will not disturb the conviction. *United States v. Prater,* 32 M.J. 433 (1991). The "mere possibility" of a conflict between the matter and the guilty plea does not necessarily require rejection of the plea. *Prater,* 32 M.J. at 436; *United States v. Logan,* 22 U.S.C.M.A. 349, 47 C.M.R. 1, 1973 WL 14641 (1973).

---

**17.** However, the military judge is not required to "embark on a mindless fishing expedition to fer- ret out or negate all possible defenses." *United States v. Jackson,* 23 M.J. 650 (N.M.C.M.R.1986).

### c. The Summarized Record and Appellate Record

■ Before we analyze whether petitioner has carried her extremely heavy burden to show by extraordinary circumstances why she is entitled to relief from what she argues is a flawed guilty plea inquiry, several points regarding the record are pertinent. First, we are considering a summarized record of trial which, by its very nature, deprives us of knowing with certainty what was or was not said at trial, although we accept the record as we find it. Given the posture of the case, we construe the record, including any factual gaps and ambiguities, in the light most favorable to the government. *United States v. Hubbard,* 28 M.J. 203 (C.M.A.1989) (Cox, J., concurring); *United States v. Slaughter,* 42 M.J. 680 (Army Ct.Crim.App., 1995). Second, the summarized record does not reflect a number of matters relevant to whether petitioner's pleas were improvident based on a public policy violation. For example, the record summary does not indicate that petitioner received rolls of quarters or other coins suitable for slot machines in exchange for her checks. The record does not reveal that the club afforded petitioner credit in order to gamble, or that club management or other personnel knew petitioner would use the proceeds of the checks for gambling. There is no showing of where the check-cashing facility was located in relation to the slot machines, or the degree to which the cashier facilities were used by non-gambling patrons. The record is silent on any indicia of club involvement with petitioner's gambling activity, aside from statements that she cashed checks to gamble in on-site slot machines. Third, by pleading guilty, petitioner voluntarily gave up her opportunity to litigate fully all the circumstances surrounding her conduct. Post-trial speculation regarding those circumstances is not appropriate. *United States v. Faircloth,* 45 M.J. 172, 174 (1996); *United States v. Harrison,* 26 M.J. 474, 476 (C.M.A.1988). *See also United States v. Lark,* 47 M.J. 435, 437 (1998) (Sullivan, J., concurring). Fourth, petitioner does not state what additional facts she would have told the military judge that would have required him to reject her pleas as improvident under *Wallace.* Finally, on the record before us, petitioner first complained that her pleas were improvident after completion of her Article 69(a), UCMJ, review—she failed to raise any issue at trial, in her otherwise extensive R.C.M. 1105 submissions to the convening authority, or in an Article 38(c), UCMJ, brief.

### d. Application of Criteria for Extraordinary Relief

#### (1) Writ of Mandamus

■ The petitioner has not satisfied the criteria for relief under a writ of mandamus. Regarding the trial court's ruling that the petitioner's plea was provident, we first observe—as well as we can from a summarized record—that the military judge conducted a thorough plea inquiry. We recognize that the summarized record does not reflect an inquiry into matters pertinent to whether the NCO Club and Bowling Center were participants in gambling transactions when petitioner cashed her worthless checks. When the petitioner advised the military judge that she used the proceeds of the checks to gamble in slot machines, we agree, at least as a matter of prudence, that he should have conducted an inquiry to decide whether the transactions were part of gambling activity. If the transactions were part of the gambling, of course, the military judge should have rejected the plea because of the public policy protections under *Walter, Lenton,* and *Wallace.* Petitioner has failed, however, to carry her burden to establish that such an inquiry did not take place—she did not even assert in her petition that the military judge failed to conduct the necessary inquiry.

For purposes of analysis, ·and since this summarized record appears well-prepared, we will assume—but not hold—that the military judge did not conduct a *"Wallace"* inquiry. The first question then is whether it was error not to conduct such an inquiry. Some might reasonably argue that petitioner's statements that she gambled with the proceeds of the checks were not *per se* inconsistent with her plea, and therefore, the military judge did not have a duty to inquire. The argument is that until she reasonably implicated the payee of the checks *in the*

gambling activity by virtue of cashing the checks, no inquiry was necessary. Most will agree, however, that the better practice, if not the legal requirement, would have been to conduct further inquiry to clarify whether these checks were part of a gambling transaction. In either event, we are satisfied that the military judge was acting well within "the sphere of his discretionary power" when he conducted the plea inquiry, even though he may be criticized for failing to conduct a fuller inquiry. *Dettinger*, 7 M.J. at 218. The military judge did not commit gross error or usurp his judicial power. Petitioner has failed to demonstrate clearly and indisputably that the writ is necessary "to confine a lower court to its prescribed jurisdiction" or to otherwise present extraordinary circumstances justifying relief. *Roche*, 319 U.S. at 26, 63 S.Ct. at 941–42.

In analyzing petitioner's request for relief from The Judge Advocate General's decisions that the trial was legally sufficient, we will assume *arguendo* that the trial judge erred. Under the criteria for mandamus relief, the question is whether The Judge Advocate General's decision affirming the legal sufficiency of the trial was more than gross error—that it amounted to a judicial usurpation of power. The answer is self-evident—the answer is "no."

In conducting his legal review of the providence inquiry, The Judge Advocate General should have analyzed whether the accused at trial had set up a matter *substantially* inconsistent with her guilty plea. *Prater*, 32 M.J.

at 436. In reviewing this case, one could reasonably conclude there was not a substantial conflict between the petitioner's guilty plea and her statements that the proceeds of these checks were used for gambling because there was no substantial matter indicating that by cashing the checks, the club was engaged in a gambling transaction. Furthermore, we observe that at the time of The Judge Advocate General's decision, this court had issued its opinion in *Slaughter*.[18] The Judge Advocate General could well have relied on *Slaughter*'s well-reasoned approach in a similar guilty plea case.[19] In *Slaughter*, the court focused on the involvement of the club, through its check-cashing service, with the gambling activity and concluded that the appellant had "disclosed no facts showing the degree of active involvement of the Community Club in his gambling activities as was evident in *Wallace.*" *Slaughter*, 42 M.J. at 682.

In a similar fashion, the facts disclosed by petitioner during the plea inquiry fall far short of the indicia of club involvement found in *Wallace*.[20] The Judge Advocate General could have reasonably concluded that there was no substantial conflict between matters raised by petitioner and her pleas of guilty. Therefore, we conclude that The Judge Advocate General's Article 69(a), UCMJ, review was well within reasonable bounds. More importantly, his decision does not even approach "gross error," let alone a usurpation of power.

---

18. 42 M.J. 680.

19. Our dissenting brothers posit that the validity of our rationale in *Slaughter* may have been called into question by our superior court's holding in *Allbery*. They argue that the *Allbery* court, in reaffirming the *Wallace* public policy protection, focused on the conduct of the accused rather than the collusive involvement of the club. Whatever one believes the focus of these cases to be, it must be conceded that for the public policy against the enforcement of *gambling transactions* to apply, the facts must demonstrate that the parties knowingly or constructively engaged in commercial intercourse involving gambling. Otherwise, the payee of a check would be left holding the proverbial bag anytime the payor claimed the proceeds were intended to be gambled and were, in fact, gambled. In addition to *Slaughter*, the decisions in *Walter, Lenton, Wal-*

*lace,* and *Allbery,* all analyzed the factual support for concluding that the parties were engaged in *gambling transactions.* We conclude that *Slaughter's* approach in analyzing the factual predicate for the conclusion that the club had knowingly engaged in a gambling transaction was correct. We also point out that, if *Allbery* represents a change in our superior court's analytical approach, that case was decided after the Article 69(a), UCMJ, review had been completed in this case.

20. We reject the dissent's assertion that we have "strained" petitioner's trial statements and the stipulation of fact in an effort to construe the summarized record against the petitioner or assumed facts that are not in the record as unfavorable to the petitioner. We simply have placed the burden in this extraordinary writ petition where the law directs—on the petitioner.

Applying the *Bauman* factors from the federal circuits, we find that the last three guidelines militate against granting relief: (1) we cannot say that the trial court or The Judge Advocate General were clearly erroneous as a matter of law; (2) petitioner has not demonstrated that there exists an oft-repeated error, in persistent disregard of the rules; and (3) the petitioner has not shown that the decisions below raise new important problems or legal issues of first impression. *Bauman*, 557 F.2d at 654–55. Although petitioner may argue that the first two guidelines favor relief (i.e., she has no other adequate means of relief, and she will endure irreparable damage), we would point out that petitioner had at least three opportunities to seek relief—at trial, in her R.C.M. 1105 submissions before the convening authority, and in an Article 38(c), UCMJ, brief. Under these circumstances, to argue in one breath that the public policy protection is well-settled and should have been applied to her, and in the next that she has no other adequate means to seek relief other than by extraordinary writ, is disingenuous. Petitioner's failure to assert the error until after completion of ordinary appellate review diminishes the vitality of those two *Bauman* factors.

Finally, this is not an Article 66, UCMJ, appeal. We must not, and should not, substitute our judgment for that of either the military judge or The Judge Advocate General. *Porter*, 32 M.J. 583 (A.C.M.R.1990). Petitioner has failed to satisfy her burden to justify granting a writ of mandamus.[21]

### (2) Writ of Error Coram Nobis

■ Just as with her petition for relief under mandamus, petitioner bears an extremely heavy burden in justifying her entitlement to relief under a writ of error coram nobis. We will try to avoid repeating the analysis discussed above under mandamus, but many of the reasons for denying mandamus are pertinent to coram nobis analysis because, again, petitioner has asked for an *extraordinary remedy*. Our analysis involves balancing the *Tillman* factors outlined above.

We do not find petitioner's argument persuasive that, in accepting her guilty plea, the military judge committed such egregious error as to render the proceedings irregular and invalid, amounting to a miscarriage of justice. We have already found that, in light of the public policy considerations of *Walter*, *Lenton*, and *Wallace*, a military judge could come to a reasonable conclusion that the plea was provident. To reiterate, the critical factor in these cases is whether the check transaction was a part of, or entirely separate from, the gambling activity. *Lenton*, 25 C.M.R. at 197. At trial, petitioner simply said she spent all the proceeds on gambling. She did not raise any of the factors that were

---

**21.** We categorically disagree with the dissent's analysis in their Part III, entitled "Writ of Mandamus." Contrary to their conclusions, petitioner has utterly failed in her burden to show clearly and indisputably that mandamus should issue to direct The Judge Advocate General to send this case to us under Article 69(d), UCMJ.

Under Article 69(d), UCMJ, Congress gave The Judge Advocate General unqualified statutory authority to decide whether a particular case, normally reviewed by The Judge Advocate General under Article 69, UCMJ, should be sent to this court for review under Article 66, UCMJ. The dissent presumes to incorporate statements of legislative intent into Article 69(d), UCMJ, and thereby establish standards by which The Judge Advocate General must exercise his statutory discretion and upon which he may be judged when he decides not to send us the case. We reject this analysis. Moreover, the dissent utilizes an abuse of discretion standard in analyzing whether this court can order The Judge Advocate General to send us the case for Article 66, UCMJ, review. Our research reveals that the courts have only applied such a standard for mandamus in cases in which the convening authority has denied deferment of confinement under Article 57(d), UCMJ, when the discretionary decision is "suffused with legal error." *Longhofer v. Hilbert*, 23 M.J. 755 (A.C.M.R.1986) (citing *Pearson v. Cox*, 10 M.J. 317 (C.M.A.1981)). *See also United States v. Brownd*, 6 M.J. 338 (C.M.A.1979). We believe the proper criteria in this case is that the *petitioner* has the heavy burden to show clearly and indisputably that she is entitled to mandamus based on The Judge Advocate General's usurpation of power, beyond gross error, in not sending this case to us. "Mandamus is not available to compel either a judicial or executive officer to exercise discretion in such a way as to reach a particular result." *Wean v. Holder*, 47 M.J. 540 (Army Ct.Crim.App.1997). Finally, the dissent's argument that the number of Article 69(d), UCMJ, referrals "could be 'characterized as an erroneous practice which is likely to recur'" is meritless and warrants no further comment.

present in *Wallace* to indicate that the club and bowling center check-cashing services facilitated her gambling activity, or that they otherwise were participants in a gambling transaction by cashing her checks. Even if we were to find that what petitioner did say should have caused the military judge to conduct further inquiry, that is a far cry from the conclusion that the proceedings were so irregular or invalid as to be characterized as a manifest miscarriage of justice. We hold, therefore, that petitioner has failed in her burden at least in regards to the last, and perhaps the most important, *Tillman* factor: that the error was of such fundamental nature as to render the proceedings irregular and invalid. *Tillman*, 32 M.J. at 965.

Examining the other three *Tillman* factors, we find no valid reason why petitioner did not previously attack her conviction on the basis of the allegedly defective plea inquiry (factor three). Similarly, petitioner cannot sustain her burden on factor one: "[A]n error had been made that was unknown to [petitioner] during appeal." *Tillman*, 32 M.J. at 965. We perceive no way that the error was not known to her, or reasonably should not have been known by her, during her Article 69(a), UCMJ, appeal. In petitioner's own brief, she argues that the public policy considerations discussed in *Wallace* existed for thirty years, including at the time of her trial, and that *Allbery* "simply validated the 30–year old, never overruled case of *Wallace*." We agree. As to the second *Tillman* factor (a more usual remedy is available), we find that the opportunity to raise the issue at trial, before the convening authority, and before The Judge Advocate General, are facts which strongly militate against issuance of a writ of error coram nobis. *Tillman*, 32 M.J. at 965. Coram nobis contemplates an error previously unknown to the petitioner and not apparent to the court during its earlier consideration of the case. *Frischholz*, 36 C.M.R. at 309. Neither is true in this case.

The *Tillman* factors are not hyper-technical rules designed to set traps for the unwary criminal litigant. These factors articulate society's interest in the finality of appeals which must be balanced against petitioner's

claimed error. The burden is heavy, and the criteria for relief necessarily more stringent than for relief on ordinary appeal. We believe the greater standard, one amounting to a strong showing of a miscarriage of justice, is required before extraordinary relief in the nature of coram nobis is granted. In our judgment, petitioner has failed to carry her burden.

Accordingly, we would deny the Petition for Extraordinary Relief in the Nature of a Writ of Mandamus and a Writ of Error Coram Nobis.

Chief Judge COOKE, Senior Judges EDWARDS and TOOMEY, and Judges CARTER and NOVAK concur.

JOHNSTON, Judge, with whom were Senior Judge GORDON, Judges SQUIRES, ECKER, and GONZALES, concurring in part, dissenting in part, and commenting separately:

The court is unanimous in concurring in portions of the lead opinion: Part I, History of the Case, and Part II, Whether this Court has Jurisdiction. Six of us disagree in part, however, about the criteria to apply in determining whether petitioner is entitled to relief, and in granting relief. Because of the importance of the issues involved, we invite the United States Court of Appeals for the Armed Forces (formerly the Court of Military Appeals) [hereinafter Court of Appeals] to provide guidance in those areas of the law where this court is divided.

This writ petition concerns a compulsive gambler who wrote worthless checks to play the slot machines at Fort Clayton, Panama. She was convicted in violation of the public policy enunciated in *United States v. Wallace*, 15 U.S.C.M.A. 650, 36 C.M.R. 148, 1966 WL 4432 (1966), when the military judge accepted her guilty pleas without determining whether the policy protection applied. Petitioner's conviction was affirmed after a review under Article 69(a), UCMJ, even though Article 45(a), UCMJ, was not applied properly at trial to the gambling issue. When these errors became evident to petitioner, she asked The Judge Advocate General to take corrective action or send the case

to our court. He did neither. Unlike the lead opinion, we conclude that the failure to set aside petitioner's conviction is a miscarriage of justice. She should be convicted, if at all, only after the factual basis of her guilty plea is thoroughly examined in light of the public policy enunciated in *Wallace*.

## I. Factual Background

Petitioner, a former master sergeant with over sixteen years of service, had a serious gambling problem while stationed in Panama. Between January and June 1994, she wrote and cashed thirty-seven checks worth $7,350.00 at the Fort Clayton, Panama, Noncommissioned Officers' (NCO) Club and the Fort Clayton Bowling Center to obtain money to support her gambling activities at on-site slot machines. She was charged with violations of Article 123a, UCMJ, making and uttering checks without sufficient funds, because her account balances were insufficient to cover the checks.

The petitioner, who had been diagnosed as a compulsive gambler, pleaded guilty at her general court-martial to five specifications of making and uttering worthless checks by dishonorably failing to maintain funds in violation of Article 134, UCMJ. The summarized record of trial appended to the petition indicates that during the guilty plea inquiry she testified:

> What happened with regard to the checks is that I wrote them and gambled with it. Sometimes I would spend a lot of time there gambling and sometimes I wouldn't because sometimes the money wouldn't last that long. . . .

> [The checks] were all presented to the NCO Club, with the exception of [two] written at the bowling alley. . . .

> I gambled every bit of the money away that I received from those checks. I put it in the slot machines.

The stipulation of fact admitted at trial also contained pertinent information as follows:

> The accused made and uttered each of the 37 worthless checks . . . for the purpose of obtaining money with which she could gamble on slot machines.

The stipulation of fact incorporated a written statement made by the petitioner to Army criminal investigators:

> About May 94, I began writing checks to the Ft. Clayton NCO club for the purpose of obtaining money with which I could gamble. When I began writing the checks, I would write them for about $100.00. I would gamble the money by placing it into the slot machines. When I would lose the $100.00 to the slot machines, sometimes I would return later in the day and cash additional checks for about $100.00. I believe the check cashing limit for the NCO club is $300.00 per day. On a rare occasion, if I knew the teller at the NCO club, sometimes I was able to cash an additional check beyond the $300.00 limit, but they would always limit the amount of the check to approximately $25.00. . . . As I continued to write checks to the Ft. Clayton NCO club, the amounts and frequency of the checks increased. Instead of writing three checks to obtain the check cashing limit for a day, I would write one check for the $300.00 limit and use the $300.00 in gambling.

The stipulation of fact set forth a chronology of all the checks showing extensive participation by the petitioner in transactions involving gambling. She wrote thirty-five worthless checks for a total of $7,000.00 to the NCO Club over the course of thirty-five days. She cashed three checks at the NCO Club totaling $450.00 on one date and two checks for a total of $600.00 on another date.

During the sentencing proceedings at her court-martial, petitioner made additional comments that are pertinent to the providence of her guilty plea:

> When I was sitting there in the NCO Club putting my money in the machines, I was thinking about the lights, the money dropping out, I was just in a world of my own. No one could break in on me. I was right there and I was content. I wasn't thinking about the money. I was going to play more. When I went home I thought about what I was going to do the next day to get money to go play the slot machines. I wanted to get back the money I lost. It is called "chasing your money." "Chasing

your money" is when you go in and put a certain amount of money into the slot machine. It seems to be a lot of money and you wish you could get it back. What you do is you go back to the very same slot machine and try to win what you put in it.

A sergeant major, who worked with her and supervised her work, testified on her behalf during sentencing and stated, in pertinent part:

> [A]ny normal person would not sit and write checks night after night, which is exactly what she did. I went over and checked in the club. *The club manager told me that she was there.* Several other people told me that she was there. *She would be there night after night.* No normal person would do that. The money that she was getting from the checks, she was just putting it right back in the machines. All of the checks were written at the club and AAFES at the PX, when she couldn't write them at the club anymore. She would come right back over there and put the money in the machine. *They would give her those coins and she would sit right there and put the money back in the machines.* She is not an extravagant person. She never bought anything that I knew of. She never bought any clothes or went out to dinners. She spent all her time at the club at the slot machines.

(emphasis added).

## II. Writ of Error Coram Nobis

Petitioner requests that the findings and sentence be set aside pursuant to her writ of error coram nobis. Coram nobis is an extraordinary remedy predicated on exceptional circumstances not apparent to the court in its original consideration of the case. *United States v. Frischholz,* 16 U.S.C.M.A. 150, 36 C.M.R. 306, 309, 1966 WL 4467 (1966). "Under coram nobis, a court can remedy an earlier disposition of a case that is flawed because the court misperceived or improperly assessed a material fact." *McPhail v.*

*United States,* 1 M.J. 457, 459 (1976). Under coram nobis, this court may act to correct an injustice. *See United States v. Montcalm,* 2 M.J. 787 (A.C.M.R.1976).

While coram nobis at one time was not thought to encompass errors of law, the modern view adopted in military practice is that the writ "now appears to encompass constitutional and *other fundamental errors." See Garrett v. Lowe,* 39 M.J. 293 (C.M.A.1994). Fundamental errors would include the denial of fundamental rights accorded by the UCMJ. *See United States v. Bevilacqua,* 18 U.S.C.M.A. 10, 39 C.M.R. 10, 12, 1968 WL 5042 (1968).

### a. Article 45(a), UCMJ

One fundamental right accorded by the UCMJ is the manner in which guilty pleas must be processed at trial by the military judge. Article 45(a), UCMJ, 10 U.S.C. § 845, in pertinent part, states:

> (a) If an accused ... after a plea of guilty sets up matter inconsistent with the plea or if it appears that he has entered the plea of guilty improvidently ... a plea of not guilty *shall* be entered in the record, and the court shall proceed as though he had pleaded not guilty.

(emphasis added).

When an accused presents matter inconsistent with the plea, "the military judge must either resolve the apparent inconsistency or reject the plea." *United States v. Garcia,* 44 M.J. 496, 498 (1996). However, the "mere possibility" of conflict between an accused's statements and a guilty plea does not necessarily require rejection of the plea. *See United States v. Logan,* 22 U.S.C.M.A. 349, 350–51, 47 C.M.R. 1, 2–3, 1973 WL 14641 (1973); *United States v. Brooks,* 26 M.J. 930 (A.C.M.R.1988). Rather, rejection of the plea is required when the record of trial shows a substantial basis in law and fact for questioning the guilty plea. *See United States v. Prater,* 32 M.J. 433, 436 (C.M.A. 1991).[1] The petitioner contends that if the

---

**1.** Explicit guidance for Army courts and appellate authorities confronting the issue of convicting a soldier of worthless check offenses for gambling was provided by this court on 21 No-

vember 1996. In *United States v. Green,* 44 M.J. 828 (Army Ct.Crim.App.1996), this court stated:

> If a guilty plea inquiry for a bad check offense raises facts that provide a substantial basis to believe that the check cashing operation was

military judge properly had applied Article 45(a), UCMJ, in light of the stipulation of fact and the facts presented at trial, he would have found her pleas improvident.

### b. The Public Policy Protection of *United States v. Wallace*

Petitioner asserts that, as a result of inadequate factual inquiry and defective legal analysis at trial and on appeal, she has been denied the public policy protection afforded to soldiers in regard to check transactions involving gambling. The Court of Appeals, has, on the basis of public policy, consistently refused to sustain criminal proceedings in the military justice system based upon worthless or subsequently dishonored checks issued in connection with gambling games. *See United States v. Walter*, 8 U.S.C.M.A. 50, 23 C.M.R. 274, 1957 WL 4479 (1957). In *United States v. Lenton*, 8 U.S.C.M.A. 690, 25 C.M.R. 194, 1958 WL 3111 (1958), the court held a guilty plea to a worthless check offense improvident because the incident arose out of a gambling transaction.

In *Wallace*, the Court of Appeals reviewed both federal and military cases and stated:

> The sum of these cases is that the issuance of a worthless check in a gambling game *or as a means of facilitating a gaming transaction* cannot be made the basis of criminal prosecution. . . .

36 C.M.R. at 151 (emphasis added). The court also made specific pronouncements of public policy applicable to courts-martial:

> Whether gaming is legal or illegal, transactions involving the same or designed to facilitate it are against public policy, and the courts will not lend their offices to

enforcement of obligations arising therefrom.

> . . . .

> We will not therefore, lend the offices of the criminal law to the taking of punitive measures for the nonpayment of gambling obligations.

*Id.* at 149–51. The significance of these pronouncements cannot be underestimated—at the time they were made, they came from the highest judicial body reviewing military cases.

The Court of Appeals reiterated its public policy statement in dicta in *United States v. Woodcock*, 39 M.J. 104 (C.M.A.1994):

> The crux of our decision in *Wallace* was that gambling is against public policy, and we will not enforce commercial transactions evolving therefrom.

*Id.* at 105.[2]

### c. Analysis of Petitioner's Claim

The Court of Appeals in *Wallace* stated that the NCO Club "cannot look to the law as 'a club to hold over those foolish enough to engage in this type of dissipation [playing the slot machines].'" 36 C.M.R. at 151 (citation omitted). *Wallace* had not been modified or overruled at the time of petitioner's court-martial on 6 March 1995. Petitioner's stipulation of fact, her rendition of the facts during the plea inquiry, and her statement and other testimony during sentencing, provided a substantial basis in law and fact for questioning the guilty plea. The military judge should have realized that the *Wallace* policy was implicated. The military judge, however, did not address the policy issues raised by

---

designed to facilitate gambling and the military judge does not resolve that inconsistency, then this court must set aside the finding of guilty. 44 M.J. at 829 (citations omitted).

**2.** The consistency of the Court of Appeals' statements of public policy concerning gambling transactions was evident in *United States v. Allbery*, 44 M.J. 226 (1996). In that case, the court set aside the findings and sentence and dismissed the charges brought against a servicemember who wrote worthless checks for the purpose of playing slot machines at the Ramstein Air Base Enlisted Club. In analyzing the facts of that case, the court stated again its public policy concerns about gambling:

[T]here surely seems to be a continued public concern about its too-frequent victimization of those who are ill-equipped emotionally to handle the risks. When gaming establishments offer the convenience of check-cashing in order to facilitate on-site gambling, they also offer the means by which a patron might lose the farm, both literally and figuratively. Where gambling is legal, the house might permissibly fleece the patron of all he brings with him, but it remains against public policy to encourage further fueling the emotional heat of the moment by "enforcing obligations arising therefrom."

*Id.* at 229–30 (quoting *Wallace*, 36 C.M.R. at 149).

*Wallace* when he accepted the petitioner's pleas of guilty.

In our view, the record as a whole shows that all petitioner's worthless checks were commercial "transactions involving" gambling. The confluence of facts shown in the record implicated the public policy protection. Thus, *Wallace* appeared to apply, and the military judge should have clarified the facts to ensure that the plea was provident.

Petitioner's court-martial was reviewed under the provisions of Article 69(a), UCMJ, on 30 August 1995 in the Office of The Judge Advocate General. Trial defense counsel submitted no issues for review. It is not apparent whether the policy in *Wallace* was considered during the examination of the record of trial in the Office of The Judge Advocate General. The court-martial data sheet used for reviewing the case merely indicated "[l]egally sufficient; no Art. 59(a) errors noted"[3] and "[l]egally sufficient [under the provisions of] Art. 69(a), UCMJ."

Once a guilty plea has been accepted as provident at trial, it will be set aside on appeal only if the record contains some evidence in substantial conflict with the pleas of guilty. *See United States v. Higgins*, 40 M.J. 67 (C.M.A.1994); *United States v. Hebert*, 1 M.J. 84 (C.M.A.1975). *See also Prater*, 32 M.J. 433. The review conducted under Article 69(a), UCMJ, in the Office of The Judge Advocate General concluded that peti-

tioner's court-martial was "legally sufficient." We are at a loss to discern how the review could have come to this conclusion without additional and extensive inquiry by the military judge, because matters presented at trial showed a substantial basis in law and fact to question the plea. As in *Wallace*, the checks in this case were accepted by the club "to facilitate [the] accused's play of its gambling devices, and were not therefore 'check transaction[s] . . . entirely separate from the gambling activity.'" *Wallace*, 36 C.M.R. at 151 (citation omitted).[4]

The facts in the guilty plea recorded here are detailed and extensive. When the facts are viewed in the light most favorable to the government, *not only do they show a substantial conflict with the plea, they also suggest that the conviction itself was improper.* Matters developed on the record were sufficient to impose a duty on the military judge under the provisions of Article 45(a), UCMJ, to inquire further to ensure that the plea was provident and *that the criminal law was available as a sanction.*[5]

The criteria for granting relief coram nobis are set forth in *Tillman v. United States*, 32 M.J. 962 (A.C.M.R.1991). The fairest reading of the facts in this record[6] suggests that no one involved in this case—not the military judge, not the trial counsel, not the defense counsel, not the staff judge advocate or the convening authority, and not even the officer

---

3. Article 59(a), UCMJ, 10 U.S.C. § 859(a), provides that a finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused.

4. While we believe that the edict in *Wallace* was intended to be read broadly, the case could have been interpreted at the time of trial as having several factual prerequisites: checks written to a club; checks cashed in an area near the slot machine; coins supplied by club personnel that are promptly placed into the club's slot machines; and, all the preceding done with the knowing and implicit encouragement of the club. All of these factual prerequisites were implicated in petitioner's court-martial by the stipulation of fact, the colloquy with the military judge, and other matters presented at trial. Even if *Wallace* was read this narrowly, the facts presented at trial clearly imposed a duty on the military judge to conduct further inquiry before accepting the plea.

5. *See United States v. Greenlee*, 47 M.J. 613 (Army Ct.Crim.App.1997). "To whatever extent the accused's actions indicate an intent to use a certain amount of the proceeds from a worthless check on the club's gambling activities, the public policy protection [of *Wallace*] is not only available, it *must* be applied." 47 M.J. at 615 (emphasis added).

6. The lead opinion strains in its efforts to construe petitioner's testimony, the stipulation of fact, and the summarized record against the petitioner. There is a critical difference between: (1) construing evidence in the record in a light most favorable to the government; and, (2) assuming facts not evident in the record are unfavorable to a soldier who pleads guilty. The lead opinion speculates and does the latter. The deficiencies the lead opinion highlights in the record should have been clarified by the military judge in accordance with Article 45(a), UCMJ, prior to accepting the pleas as provident.

conducting the Article 69(a) review—realized that the policy protection in *Wallace* was applicable. *See Tillman*, 32 M.J. at 965 (factor one—error was unknown during appeal). It was not until after the Court of Appeals' opinion in *Allbery* that petitioner recognized that the "truly astonishing" facts in *Wallace* were not controlling in her case—that extensive and collusive actions by the NCO Club were not necessary to implicate the public policy against enforcing worthless checks issued by an accused to facilitate gambling on site. *See Tillman*, 32 M.J. at 965 (factor three—valid reasons exist for not previously attacking the conviction). When she realized that her guilty plea was improvident even without collusive involvement by the NCO Club, she asked The Judge Advocate General to grant her relief or send the case to us. Contrary to the legislative history of Article 69(d), UCMJ, he did neither. *See Tillman*, 32 M.J. at 965 (factor two—a more usual remedy is unavailable). Petitioner, however, is clearly and indisputably entitled to have her *Wallace* issues fully considered at trial before her conviction is affirmed. In light of the mandate of Article 45(a), UCMJ, and, more importantly, the nature of the issues involved, the failure to do so is an error of such a fundamental nature as to render her court-martial proceedings invalid. *See Tillman*, 32 M.J. at 965 (factor four—fundamental error renders the proceedings irregular and invalid).

Because of the inadequate plea inquiry, petitioner never received full and fair consideration at trial of the public policy protection enunciated in *Wallace*. She was convicted even though worthless checks to facilitate gambling "cannot be made the basis of a criminal prosecution" in the military. *Wallace*, 36 C.M.R. at 151. Coram nobis should issue to ensure that justice is done in petitioner's case. *See United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954)(coram nobis should be granted under circumstances compelling such action to achieve justice).

### III. Writ of Mandamus

Unlike the lead opinion, our mandamus analysis does not focus on decisions by the trial judge or on the review of petitioner's court-martial conducted pursuant to Article 69(a), UCMJ. Consequently, we do not address the applicability of mandamus relief to those substantive decisions made under Article 69(a), UCMJ.

Petitioner has asked us to issue a writ of mandamus ordering The Judge Advocate General to send her court-martial to this court for appellate review in accordance with Article 69(d), UCMJ.[7] Counsel for respondents assert that an unreviewable decision

---

7. Petitioner explicitly requested a writ of mandamus ordering The Judge Advocate General to refer her court-martial to us for appellate review under Article 69(d), UCMJ. Both the *"Preamble"* and *"Relief Sought"* portions of her Petition for Extraordinary Relief in the Nature of a Writ of Mandamus and a Writ of Error Coram Nobis request this court to:

> [I]ssue a writ of mandamus either ordering The Judge Advocate General to set aside the findings and sentence of the Petitioner's court-martial, or ordering him to refer Petitioner's court-martial to this Court for appellate review; or, alternatively, that this Court issue a writ of error coram nobis ordering that the findings and sentence be set aside.

*Petitioner has not withdrawn or eliminated this explicit request.* Petitioner's original Brief in Support of Petition, filed on 12 November 1997, supported the request for relief with coherent and concise arguments. Her supplemental Brief in Support of Petition, filed on 2 March 1998, asked for *additional* relief based on the theory of original appellate review under Article 69(d)(2).

Because the case was not sent to us, petitioner has been saddled with the heavy burden incum-

bent in a writ. Petitioner now must show that extraordinary circumstances exist and that she is clearly and indisputably entitled to the relief sought.

The decision to not send the case to us also resulted in petitioner being subjected to a legal standard different from the standard applied to the soldiers whose convictions were set aside in *Wallace* and *Green*. As this case may be legally indistinguishable from those cases, inconsistent results within the Army appellate review structure lead to serious questions of injustice. We are certain that the validity of a conviction by a general court-martial should be judged on appeal by the same legal standard, whether that review is conducted by the Office of The Judge Advocate General under Article 69(a), UCMJ, or by this court under Articles 66 or 69(d), UCMJ. Both the Senate and House reports accompanying the final bill for the original UCMJ indicated that it would assure that all persons facing a court-martial would be "subject to the same law." *See Uniform Code of Military Justice:* S.Rep. No. 81–486; H.Rep. No. 81–491 (1949), *reprinted in* 1950 U.S.C.C.A.N. 2222, 2223.

was made under Article 69(d), UCMJ, to not send the case to us.[8] We disagree. Potential appellate jurisdiction clearly is sufficient for this court to assert its supervisory jurisdiction and review authority under the All Writs Act. *See* Edward H. Cooper, *Extraordinary Writ Practice in Criminal Cases: Analogies for the Military Courts,* 98 F.R.D. 593, 603 (1983).

The statutory provisions allowing The Judge Advocate General to send cases to us are not of recent vintage. When the UCMJ was enacted in 1950, Article 69 contained a provision for appellate review that was to be conducted by a Board of Review under Article 66 "if the Judge Advocate General so directs." In such an event, however, there was to be "no further review by the Court of Military Appeals" without certification of the issue by the Judge Advocate General.

Congress created the review scheme encompassed by Article 69, UCMJ, because these cases were thought to involve only "minor sentences so that, generally speaking, review by the Court of Military Appeals is unnecessary and would only overload the court." S.Rep. No. 81–486, *reprinted in* 1950 U.S.C.C.A.N. 2256. Congress recognized, however, that some of these cases with minor sentences may require additional appellate review:

> [S]ince even minor cases may involve major differences of interpretation between the services, the authority is provided to

allow the Judge Advocate General to send such cases up for review.[9]

*Id.*

Congress changed pertinent portions of Article 69, UCMJ, when it passed Section 1302 of the National Defense Authorization Act for Fiscal Years 1990 and 1991, Pub.L. No. 101–189, 103 STAT. 1576 (1989). That section, a provision entitled APPELLATE REVIEW OF ARTICLE 69 ACTIONS, added Article 69(d) and 69(e), UCMJ. The legislation also deleted the following sentence from Article 69(a), UCMJ.

> If the Judge Advocate General so directs, the record shall be reviewed by a Court of Military Review under section 866 of this title (article 66) but in that event there may be no further review by the Court of Military Appeals except under section 867(b)(2) of this title (article 67(b)(2)).

The language in the revised Article 69(d), UCMJ, is significantly different:

> A Court of Criminal Appeals may review, under section 866 of this title (article 66)—
> (1) any court-martial case which (A) is subject to action by the Judge Advocate General under this section, and (B) is sent to the Court of Criminal Appeals by order of the Judge Advocate General; and,
> (2) any action taken by the Judge Advocate General under this section in such case.[10]

The House Conference Report accompanying the legislation indicates that Congress

---

**8.** Respondent counsel's argument that we may not review the decision not to send a case to us is somewhat circular: because The Judge Advocate General has not sent the case to us, we have no potential jurisdiction for which a writ may issue. This begs the question and assumes as true what is to be proved. *See* Ruggero J. Aldisert, Logic For Lawyers 11–30 (1992).

**9.** It is important to note that cases involving differences of interpretation were to be reviewed by a Board of Review, a function now fulfilled by the service courts of criminal appeals. While the intervening years saw statutory changes that authorized the Judge Advocate General to take corrective action for errors found during a review under Article 69, UCMJ, the original legislative purpose for sending cases for further appellate review did not change as Article 69 was amended. Petitioner's court-martial aptly illustrates the validity of the legislative history—her case

involves different interpretations of the substantive rules of law applicable to worthless checks issued to facilitate the use of slot machines.

**10.** The amended statute provides for discretionary review in the service courts of criminal appeals. The legislation also removed in Article 69(a), UCMJ, the requirement that The Judge Advocate General certify an issue in accordance with "Article 67(b)(2)," now Article 67(a)(2), before further review was possible in the Court of Appeals. Thus, in a sweeping change, Article 69(d) expanded the statutory jurisdiction of the service courts of criminal appeals and the Court of Appeals by providing for appellate review of all courts-martial reviewed under Article 69, UCMJ. *See United States v. Kelly,* 45 M.J. 259, 266 (1996); *Lemoine v. Baker,* 36 M.J. 86 (1992)(summary disposition); *United States v. Watruba,* 35 M.J. 488, 495 (1992).

intended for The Judge Advocate General to send several specific types of cases to us:

> It is the intention of the conferees that, *at a minimum,* cases involving interpretation of the Manual for Courts–Martial, the Uniform Code of Military Justice, and the Constitution—as well as other important questions of law—be referred *for decision* by the Courts of [Criminal Appeals].

*National Defense Authorization Act for Fiscal Years 1990 and 1991:* H.R. CONF. REP. No. 101–331, at 657, *reprinted in* 1989 U.S.C.C.A.N. at 1115 (emphasis added)[hereinafter H.R. CONF. REP. No. 101–331]. *The importance of this guidance cannot be underestimated in ensuring that the military justice system operates as intended.*

While we are aware of the pitfalls in attempting to discern the meaning of a statute from reviewing provisions purporting to state legislative intent, we are satisfied that the provisions cited above were intended by Congress to direct the Judge Advocates General in determining which cases to send, or not to send, to the service appellate courts. In referring a case, or his action under Article 69(a), UCMJ, to our court for further appellate review, The Judge Advocate General is performing a discretionary function in the military justice system. We have no doubt that his decision can be examined by our court using the abuse of discretion standard[11] to determine whether the military justice system is functioning as intended by Congress.

Petitioner's court-martial is precisely the type of case that Congress intended for us to review. Although it is a minor case as to the approved sentence, it is a major case involving numerous important legal issues. At the time of review under Article 69(a), UCMJ, in the Office of The Judge Advocate General in August, 1995, it was evident that the law was unsettled concerning worthless checks issued to facilitate gambling.[12] Congress has intended since 1950 that differences of interpretation of the law be resolved only by our court rather than by a reviewing officer in the Office of The Judge Advocate General.

On 12 December 1996, petitioner requested The Judge Advocate General to refer her case to this court under the provisions of Article 69(d), UCMJ, for appellate review of the providence of her pleas of guilty. On 4 September 1997, The Judge Advocate General refused to send the case to us for further appellate review. At that time, however, it was apparent that our superior court had intended that *Wallace* be applied broadly. For reasons that are not evident from the record before us, the Article 69(a), UCMJ, review conducted in 1995 was allowed to stand, and the case was not sent to us.

---

11. The issue of which standard of review to apply to the Article 69(d), UCMJ, decision not to refer a case to us apparently is a question of first impression in the military justice system. The decision not to refer a case to us for appellate review, however, is not a judicial decision. The "judicial 'usurpation of power' " standard necessary for issuing a writ of mandamus to a judge or court applies to the judicial decision—i.e., the *substantive appellate review decision* made under Article 69(a), UCMJ. The same standard arguably does not apply to the *referral decision* made under Article 69(d), UCMJ.

The problem arises in determining whether a case not sent to us involves an "interpretation of the Manual for Courts–Martial, the Uniform Code of Military Justice, the Constitution—as well as other important questions of law." Cases in those categories should have been referred for normal appellate review by our court. Application of the abuse of discretion standard will ensure that appropriate cases are reviewed under the provisions of Article 66, UCMJ, as specified in Article 69(d), UCMJ. Use of a standard of review other than "abuse of discretion" would frustrate congressional intent. *See Pearson v. Cox,* 10 M.J. 317 (C.M.A.1981)(abuse of discretion standard applies to extraordinary writ challenging discretionary action under Article 57(d), UCMJ); *Longhofer v. Hilbert,* 23 M.J. 755 (A.C.M.R.1986)(petition for extraordinary relief reviewed under an abuse of discretion standard).

12. The Air Force Court of Criminal Appeals in *United States v. Allbery,* 41 M.J. 501 (A.F.Ct.Crim.App.1994), had declined to apply the policy protection of *Wallace* because, in their view, public policy had changed over the years. Our court did not reach that issue in *Slaughter* because we were able to apply the policy, but distinguished the case on its unique facts. *United States v. Slaughter,* 42 M.J. 680 (Army Ct.Crim.App.1995). Thus, when petitioner's case was reviewed on appeal, it was not clear which legal analysis to use—i.e., to apply *Wallace,* to follow *Allbery* and disregard the case, or to follow *Slaughter* and distinguish it factually. Regardless of the view taken, it cannot be denied that additional inquiry was necessary to establish the providence of petitioner's plea.

While the trial judge may be excused for missing a dormant legal issue based on *Wallace*, the significance of the issues involved had been highlighted by numerous appellate cases by the time action was taken under Article 69(d), UCMJ, on 4 September 1997.[13] In petitioner's view, the Court of Appeals in *Allbery* did not create new law; rather it "simply validated the 30–year–old, never-overruled" case of *Wallace*. *See also Greenlee*, 47 M.J. at 614 (the court in *Allbery* "reaffirmed" the 30–year–old policy first recognized in *Wallace* ). Petitioner reasons that because *Allbery* was merely clarification of "settled case law" rather than an announcement of new law, the principles of that case were binding at trial and at the time of review in the Office of The Judge Advocate General. Consequently, petitioner sought additional appellate review under the provisions of Article 69(d), UCMJ, of a decision made pursuant to Article 69(a) that was, in her view, "clearly and indisputably contrary to settled case law." When The Judge Advocate General denied her request, she sought appropriate relief by filing the pending writ.

We note that of the 641 general courts-martial examined under Article 69(a), UCMJ, during the past six years, apparently only three have been sent to our court under the provisions of Article 69(d), UCMJ. *See, e.g., United States v. Blake*, 35 M.J. 539 (A.C.M.R.1992); *United States v. Womack*, 34 M.J. 876 (A.C.M.R.1992); *United States v. Warnock*, 34 M.J. 567 (A.C.M.R.1991). One could reasonably question whether only such a small number of these general court-martial cases involved "interpretation of the Manual for Courts–Martial, the Uniform Code of Military Justice, and the Constitution" or "other important questions of law." [14] H.R. CONF. REP. No. 101–331 at 697. The failure to identify and to send appropriate cases, including petitioner's case, to this court for review could be "characterized as an erroneous practice which is likely to recur." *See United States v. Labella*, 15 M.J. 228, 229 (C.M.A.1983).[15] Such a failure provides a basis to issue a writ. Because our court has split evenly and is unable to grant relief for a writ of error coram nobis in applying an extraordinary relief review standard, we should order The Judge Advocate General to send the case to us to prevent recurring error and to ensure individual justice for petitioner.[16]

**13.** On 30 March 1995, the Court of Appeals granted review of the Air Force Court's *Allbery* decision, on the issue raised by appellate defense counsel:

Whether the Air Force Court of Criminal Appeals erred when, after finding the facts in the case *sub judice indistinguishable* from this Honorable Court's decision in *United States v. Wallace*, 15 U.S.C.M.A. 650, 36 C.M.R. 148, 1966 WL 4432 (1966), it nevertheless refused to follow that binding precedent "unless ordered by one of our superior courts to do so" because, in that court's view, "it no longer makes sense to follow *Wallace*."

*United States v. Allbery*, 42 M.J. 214 (1995)(emphasis added).

On 30 May 1995, in *Slaughter,* this court followed the holding in *Wallace.* We distinguished the case, however, when we concluded that *Wallace* was based on both: (1) a direct connection between the check-cashing services and the club's gambling activity, and (2) active involvement by the club to the point that it was a participant in gambling. As neither aspect was fully developed on the guilty plea record in *Slaughter,* and the funds involved were not used exclusively for gambling, we found *Wallace* to be inapplicable. While the holding in *Slaughter* was unavailable to the trial judge, the rationale may have affected later reviews of petitioner's court-martial.

In *United States v. Allbery*, 44 M.J. 226 (1996), several judges on the Court of Appeals accepted the view that the edict in *Wallace* is broadly applicable. The validity of our rationale in *Slaughter* may have been called into question by *Allbery* when the court focused on the airman's conduct rather than on collusive involvement by the enlisted club. *Allbery*, 44 M.J. at 227.

**14.** Petitioner's court-martial obviously meets these criteria.

**15.** Petitioner's case has generated as much discussion within our court as any other case we have considered in the past eight years. Congress clearly intended this type of case to be decided with the benefit of appellate briefs, arguments by counsel, and collegial deliberations and discussion by at least three appellate military judges applying the Article 66, UCMJ, standard of appellate review. It is inconceivable to us that anyone could suggest otherwise.

**16.** In its current appellate posture, this case clearly meets the *Bauman* factors discussed in the lead opinion. Although not applicable directly to this petition, the *Bauman* factors were created to formulate objective principles to guide the appellate courts in the exercise of all-writ powers in the "supervisory mandamus" context

## IV. Summary

What really happened in this case? The military judge accepted petitioner's guilty pleas in a seemingly routine worthless check case. The stipulation of fact, the colloquy between petitioner and the military judge, and testimony established, however, that: (1) she wrote checks to the NCO Club and bowling alley to facilitate her play of their gambling devices, (2) "they" provided her with coins, which she promptly put into their slot machines, and (3) she used all the proceeds from the checks to gamble on site. In other words, the facts clearly and indisputably show that the check transactions were not "entirely separate from the gambling activity." *Lenton*, 25 C.M.R. at 197.

The record alone shows that petitioner's check transactions were part of the gambling activity. Thus, she stands wrongly convicted. The record alone carries petitioner's heavy burden to show that she is clearly entitled to extraordinary relief in order to have the factual basis for her plea properly evaluated at trial.[17]

KAPLAN, Judge, concurring in part:

I concur with Parts I and II of Judge Cairns' opinion and with Parts I, II, and IV of Judge Johnston's opinion. Because I have concluded that petitioner is entitled to relief based on her petition for a writ of error coram nobis, I decline to join in Part III of Judge Johnston's opinion addressing the alternative remedy of a writ of mandamus to be issued to The Judge Advocate General directing referral of petitioner's case to this court pursuant to Article 69(d), UCMJ. Our authority to issue such a writ to The Judge

Advocate General is a question that need not be addressed to resolve this case. Sound judicial discretion mandates that courts exercise restraint and resolve only those legal questions dispositive of the issues in a given case.

Judge TRANT took no part in the decision of this case.

---

of ongoing litigation. *Bauman* dealt specifically with the use of a "peremptory writ" as an interlocutory appeal of a trial court order in a discrimination-in-employment suit.

17. Our analysis of these issues should not be read to suggest that minor errors occurring during appellate review under Article 69(a), UCMJ, provide a basis for collateral attack. An error which would justify relief during normal appellate review will not necessarily trigger coram nobis relief. *See United States v. Gross*, 614 F.2d 365, 368 (3d Cir.1980).

Our approach in this case also should not be read to suggest that every issue involving the providence of a guilty plea reviewed in the Office

of The Judge Advocate General under the provisions of Article 69(a), UCMJ, would provide a basis for extraordinary relief. This case should be read narrowly in accordance with the facts presented here: matters were presented at trial that were inconsistent with the guilty plea and those matters implicated a public policy that precludes enforcement in the military justice system. Consequently, petitioner's guilty plea at trial could be upheld only if the military judge solicited additional facts to show that the checks "were [entirely] separate from the gambling activity." *Wallace*, 36 C.M.R. at 151 (citing *Lenton*, 25 C.M.R. at 197).